**Terry W. LEWIS, Appellant,**

**v.**

**A.H. BELO CORPORATION and the Dallas Morning News Company, Appellees.**

**No. 2–90–126–CV.**

Court of Appeals of Texas, Fort Worth.

Oct. 22, 1991.

Rehearing Denied Dec. 18, 1991.

Hickey & Wood, P.C. and J. Jeffrey Springer, Denton, for appellant.

Jenkins & Gilchrist, P.C. and Paul C. Watler, Dallas, for appellees.

Before WEAVER, C.J., and HILL and MEYERS, JJ.

## OPINION

HILL, Justice.

Terry W. Lewis appeals from a take-nothing summary judgment in favor of A.H.· Belo Corporation and The Dallas Morning News Company, the appellees. Lewis had brought a libel suit against the appellees arising out of a newspaper article published in the Dallas Morning News in connection with Lewis's work as a debt collection attorney on behalf of Flow Hospital, formerly Denton's city/county hospital.

In his sole point of error, Lewis urges that the trial court erred by granting the appellees' motion for summary judgment because the summary judgment evidence establishes genuine issues of material fact. He argues that there are fact issues as to the truth of the article; his status as either a private individual, a public official, or a public figure; malice on the part of the appellees; the status of the article as fair comment or criticism; the defamatory nature of the article; whether the article is neutral reporting; and whether Belo is the publisher.

We affirm because we hold that, considering the "gist" of the publication in question the publication is substantially true.

■ We will affirm the appellees' summary judgment only if the record establishes that the movant has conclusively proved all essential elements of its cause of action or defense as a matter of law. *City of Houston v. Clear Creek Basin Authority,* 589 S.W.2d 671, 678 (Tex.1979). Texas applies this standard to summary judgments in defamation cases. *Casso v. Brand,* 776 S.W.2d 551, 556 (Tex.1989).

The appellees contended in their amended motion for summary judgment that they were entitled to summary judgment because: (1) the article is true; (2) the article was not published with actual malice because they did not publish it with any knowledge of any alleged falsity, nor with any reckless disregard for its truth or falsity; (3) the article is privileged as fair comment about the official acts of a public officer or other matter of public concern published for general information; (4)

many of the statements in the article complained about are not actionable because they are statements of opinion as is the alleged defamatory meaning given to the article by plaintiff; (5) the article is privileged as the neutral reporting of an audit by a responsible certified public accounting firm on a matter of legitimate public interest about a public official or public figure that was accurately and disinterestedly reported. Additionally, the A.H. Belo Corporation claimed that it was entitled to summary judgment because it is undisputed that it does not publish the Dallas Morning News.

■ We will first consider whether the News established that the statements complained of were true as a matter of law. "The truth of the statement in the publication on which an action for libel is based is a defense to the action." TEX.CIV.PRAC. & REM.CODE ANN. sec. 73.005 (Vernon 1986). A media defendant is entitled to summary judgment upon showing the substantial truth of its publication. *McIlvain v. Jacobs*, 794 S.W.2d 14, 15 (Tex.1990). We have concluded from *McIlvain* that the test used in deciding whether a publication is substantially true involves consideration of whether the alleged defamatory state-

ment was more damaging to the plaintiff's reputation, in the mind of the average reader or listener, than a truthful statement would have been. *Id.* at 16. As noted by the Supreme Court, the evaluation involves looking to the "gist" of the publication. *Id.* If the underlying facts as to the gist of the defamatory charge are undisputed, then we can disregard any variance with respect to items of secondary importance and determine substantial truth as a matter of law. *Id.* We are including a copy of the article in question as an appendix to this opinion.

■ The News published the article just after the hospital filed for bankruptcy. The financial condition of the hospital was therefore a matter of great public interest in Denton at the time of publication. Lewis claims that the article raised questions as to his proper accounting to the hospital of funds that he collected.

Nita Thurman, the reporter who wrote the article, swore in her affidavit in support of the News' motion for summary judgment that all of the article is true. Lewis swore in his affidavit in response to the motion that there were several false statements in the article. His claims are set out below:

THE ARTICLE
Headline, "Flow got fraction of collected cash."

LEWIS'S CLAIM
Flow got more cash than was collected by Lewis's office, including money paid directly to the hospital, as well as court costs paid on behalf of the hospital.

"A Denton lawyer collected $567,000 in past-due bills for Flow Memorial Hospital from 1979 through June 1985 ..."

Substantially more than $567,000 was collected between 1979 and June 1985.

"But he paid less than $6,000 to the financially troubled public hospital."

Much more than $6,000 was paid to the hospital as a result of my collection efforts. I paid court costs out of the money I collected, all of which was paid on behalf of the hospital, and I also did work on the hospital's accounts for which the hospital was paid direct by the debtor.

"Two months later, collections by attorney Terry Lewis had reached $689,575, according to a report he filed with the hospital."

I furnished status reports to the hospital that reported the sum of the collections by my office and those paid directly to the hospital. As of the date of the audit, the total collections would have been around $150,000 in excess of the amount reported by the audit report to have been collected by my office. Therefore, the collections

did not suddenly reach $689,575 two months after the audit.

"By the end of 1985, collections were more than $850,000."

Collections by the end of 1985 had not reached $850,000.

"Lewis has paid Flow $96,571.52 so far in recovered delinquent bills, hospital officials said Thursday. Most of that was paid after a professional management team was hired in mid-1986 to manage the hospital."

Flow was paid far more than the figure reported in the article. Some of the payments were directly made to the hospital.

Title, "Flow gained little in lawyer's work on past-due bills."

Flow gained well over one-half million dollars as a result of my collection efforts, and is continuing to benefit from my efforts on files that I have still pending.

"Lewis collected delinquent bills for the hospital under an informal agreement that apparently had existed since 1979."

The agreement was formal, and had been formalized by writings and by course of dealings through the years.

"Under the agreement, Lewis was first to deduct court costs from the amount he collects, then 60 percent of the balance was to go to Flow and 40 percent to Lewis."

I did not deduct court costs. The hospital got the court costs as they were recovered.

"As far as my relationship with the hospital, I am not authorized to discuss whatever my fee arrangement ... I don't recall now all the details," Lewis said.

The statement "I don't recall now all the details" was in response to another question asked in regard to how the agreement was entered into, not whether I recalled the details of the agreement.

"In 1985, board members questioned the small amount the hospital was receiving and ordered a special audit of Lewis' accounts for Flow."

To my knowledge, no board member ever raised any questions about the amount the hospital was receiving from me.

"The special audit covered the period from January 1979 through June 1985. Auditors found two letters from Lewis to the board in which he outlined two options on how to divide the money collected."

The auditors did not find the letters. The letters were pulled from a file and furnished on request.

"The option accepted was that Lewis would pay court costs of filing lawsuits on the delinquent accounts, recovering the cost, turn over 60 percent of the collections to Flow and keep 40 percent, the audit said."

The audit does not say that. I did not agree to pay the court costs, and I did not recover the court costs. The hospital received the benefit of the court costs.

"The audit stated that Flow's small share of the collections resulted from the procedure used by Lewis to determine the hospital's share."

This comment is made nowhere in the report. The comment made is "This small percentage results from the procedure used to determine when payments are made to Flow." There is no reference in the report to my procedure for determining the hospital's share.

"Flow's portion (60 percent) of the recovery on any particular account remained in the attorney's accounts to cover court costs

The report states that "Flow's portion of the recovery on any particular account remains in the trust account to cover court

expended on other accounts, the audit said."

costs expended on other accounts."

"Due to the number of accounts, court costs are commonly more than Flow's portion at any particular point in time. . . . Under current circumstances, then, it appears unlikely that Flow will receive any significant payments, the audit stated."

The audit actually states, "as a result, the money stays in the trust account to cover the court costs rather than be remitted to Flow. The situation will change only when the majority of court costs have already been spent on all the accounts and Flow's portion of the recoveries are no longer needed to finance additional court costs. It is unlikely this point will be reached in the foreseeable future due to the large volume of accounts." (We note that the audit goes on to say that, "Under current circumstance, then, it appears unlikely that Flow will receive any significant payments.")

"The auditors recommended in 1985 that the board get legal assistance to 'determine what options for change are available,' including monthly accounting for Lewis and a formal contract, if possible."

The report actually presents specific examples of the changes about which the auditors were speaking, stating, "examples of possible changes would be to limit the amount of court costs spent on any particular account or to request that no further work be done for accounts under a certain amount where no court costs have yet been spent." The audit also states, under a section of the report titled "Reporting" that "the periodic reports (Court Cost Reconciliations) prepared by Terry Lewis provide an over-all picture of the collection efforts being made. These reports also provide the basis for determining when payment should be made to Flow. We recommend that Flow request an accounting of collections and court costs on a monthly basis. Such an accounting would give Flow management a basis for determining the effectiveness of the collection effort."

---

The gist of the article is that Flow Hospital's poor financial condition caused some people to look back three years to an audit that was done because of dissatisfaction with the amount of money that the hospital was receiving from Lewis in his collection efforts; that there were no pending or contemplated criminal or grievance proceedings against Lewis in connection with the small amount of cash that the hospital was receiving from him; that, according to the audit, the cause of Lewis receiving a substantially larger share of the money collected than the hospital was the fact that the majority of the money collected was going toward covering court costs in other cases due to the large volume of cases that Lewis was handling for the hospital; and that in 1986 the hospital had turned its collections over to a collection agency. We hold that the summary judgment evidence shows that the gist of the article is undisputed.

We have set forth in detail Lewis's assertions as to portions of the article he believes to be untrue. We have reviewed those assertions and find that to the extent there is any variance between the truth as asserted by Lewis and the article itself,

that such are variances as to items of secondary importance and we may disregard these variances. *See McIlvain,* 794 S.W.2d at 16. Disregarding such variances, therefore, we hold that the article is substantially true as a matter of law. Consequently, the trial court did not err in granting summary judgment as to the News and Belo.

Lewis contends that the gist of the article is that he kept money that should have been given to the hospital under the terms of the agreement, that he owed money to the hospital under the terms of the agreement, and that he committed embezzlement or some other crime. We disagree. Even though the early portion of the article might raise such inferences, the rest of the article shows that no criminal or grievance procedures were pending or contemplated against Lewis, and that, in fact, the audit report showed that the real problem was caused by the procedure of plowing back the money recovered into court costs in other cases. In view of our determination as to this basis for summary judgment, we need not determine the other bases for summary judgment urged by the News and Belo. We overrule Lewis's sole point of error.

The judgment is affirmed.

APPENDIX

# Flow got fraction of collected cash

## Lawyer's late-bill effort spurred audit

By Nita Thurman
*Denton Bureau of The Dallas Morning News*

DENTON — A Denton lawyer collected $567,000 in past-due bills for Flow. Memorial Hospital from 1979 through June 1985 but paid less than $6,000 to the financially troubled public hospital, according to an audit ordered by the hospital.

Two months later, collections by attorney Terry Lewis had reached $689,575, according to a report he filed with the hospital. And by the end of 1985, collections were more than $850,000, said a former associate of Lewis' who asked to remain anonymous.

Lewis has paid Flow $96,571.52 so far in recovered delinquent bills, hospital officials said Thursday. Most of that was paid after a professional management team was hired in mid-1986 to manage the hospital.

Flow Hospital trustees voted last week to close the former city-county hospital, which has suffered financial woes since the early 1980s.

Mike Griffin, attorney for the hospital, said he filed a Chapter 11 bankruptcy petition Thursday, listing $3.5 million in debts and $7 mil-

Please see FLOW on Page 20A.

# Flow gained little in lawyer's work on past-due bills

Continued from Page 1A.

lion in assets.

Lewis collected delinquent bills for the hospital under an informal agreement that apparently had existed since 1979, hospital officials said. Under the agreement, Lewis was first to deduct court costs from the amount he collected, then 60 percent of the balance was to go to Flow and 40 percent to Lewis.

Lewis referred questions about his fee with Flow to hospital officials.

"As far as my relationship with the hospital, I am not authorized to discuss whatever my fee arrangement was. . . . I don't recall now all the details," Lewis said.

In 1986, the hospital board turned over collection of past-due accounts to a credit agency, officials said.

State District Judge Charles Chandler Davis confirmed that a former associate of Lewis' contacted the judge about money possibly due Flow after reading news accounts of the hospital's closing. Davis said he referred the information to Griffin and to the district attorney's office.

"It is a tragedy that Flow Hospital, apparently through neglect, was destroyed as a viable hospital. I believe that Denton and Denton County need a public hospital," Davis said.

Davis suggested that hospital directors should reconsider closing the facility if enough money can be recovered.

But Griffin said any additional money owed Flow would not affect the closing of the hospital.

District Attorney Jerry Cobb said he had heard "general allegations" but had no firsthand knowledge of anything that would warrant an investigation.

"If the board thought some money was out there, why didn't they go after it back in 1985 (when the audit occurred)," Cobb said.

County Judge Vic Burgess, who took office in 1987, called the $5,614 payment made to Flow by the lawyer between 1979 and June 1985 "incredible."

"That's about 1 percent," Burgess said. "I don't know much about it, but based on those numbers, it would appear that something was done wong. I think that needs to be looked into."

William B. Hilgers, an Austin lawyer and chairman of the Grievance Oversight Committee of the Texas Supreme Court, which monitors lawyers' ethics, said legal questions involving Flow should be referred to the Texas attorney general's office.

Lewis collected delinquent accounts for the hospital from about 1977 through 1986, officials said. In 1985, board members questioned the small amount the hospital was receiving and ordered a special audit of Lewis' accounts for Flow, officials said.

*The Dallas Morning News* this week obtained a copy of the special audit and Lewis' status report to the hospital under the Texas Open Records Act. The status report, filed by Lewis in August 1985, listed about 3,500 delinquent hospital accounts dating back to 1979, which represented $4.4 million in bad debts. He collected $689,575 of that amount.

The special audit covered the period from January 1979 through June 1985. Auditors found two letters from Lewis to the board in which he outlined two options on how to divide the money collected.

The option accepted was that Lewis would pay court costs of filing lawsuits on the delinquent accounts, recover the costs, turn over 60 percent of collections to Flow and keep 40 percent, the audit said.

The audit shows that Lewis collected $567,321 from delinquent accounts from January 1979 through June 1985. That included attorney fees, which judges routinely awarded in each lawsuit filed.

From the amount collected, Lewis claimed $228,108 for his 40 percent fee and attorney fees; paid $5,614 to Flow; and deposited the remainder to cover court costs already paid and future court costs, the audit states.

The audit stated that Flow's small share of the collections resulted from the procedure used by Lewis to determine the hospital's share.

"Flow's portion (60 percent) of the recovery on any particular account remained in the attorney's accounts to cover court costs expended on other accounts," the audit said.

"Due to the number of accounts, court costs are commonly more than Flow's portion at any particular point in time. . . . Under current circumstances, then, it appears unlikely that Flow will receive any significant payments," the audit stated.

"It was a no-win situation for Flow," said an accountant who made the audit.

The auditors recommended in 1985 that the board get legal assistance to "determine what options for change are available," including a monthly accounting from Lewis and a formal contract, if possible.

Members of the hospital board turned over delinquent accounts to a collection agency in 1986 but said they remember no other action prompted by the 1985 audit nor details of the agreement with Lewis.

"I know that it (the agreement) was on a contingent fee basis," said Dan Trammell, a lawyer who was on the board at the time. "I remember that I talked to Terry (Lewis) about it, but I don't remember any details."

Former board member Stanley Monroe said he recalled "quite an investigation going on" by hospital administrators.

"As well as I can recall, Lewis had the privilege of taking his percentage out first of any money he collected," Monroe said.

"I know that at one time he had been considered a valuable asset. But we weren't getting as much money out of it as we thought we should."