Marcy T. ROGERS, Appellant,

v.

The DALLAS MORNING NEWS, INC.,
A.H. Belo Corp., Olive Talley, and
Dolores A. Hutcheson, Appellees.

No. 05–93–00689–CV.

Court of Appeals of Texas,
Dallas.

Sept. 30, 1994.

Frank Gilstrap, James V. Cornehls, Dallas, for Appellant.

William D. Sims, Jr., Steven T. Baron, Paul C. Watler, Dallas, for Dallas Morning News, A.H. Belo Corp. and Olive Talley.

Lewis R. Sifford, Robert L. Harris, Dallas, for Dolores A. Hutcheson.

Before McGARRY, EVANS [1] and NYE [2], C.JJ.

## OPINION

EVANS, Chief Justice (Assigned).

This is an appeal from a summary judgment entered against Marcy Rogers on her claims against the *Dallas Morning News* (the "News"); a News reporter, Olive Talley; A.H. Belo Corporation; and Dolores A. Hutcheson. In her petition, Rogers alleged, among other causes of action, a claim for libel based on twelve newspaper articles written by Talley and published by the News in 1991. The trial court granted summary judgment in favor of all defendants. In her first four points of error, Rogers contends that the trial court erred in granting summary judgment on her libel claim because: (1) the published statements were false; (2) the published statements were defamatory; (3) a fact issue existed regarding whether she acted with malice; and (4) the published statements were not privileged. In her fifth point of error, Rogers contends that the trial court erred in denying her motion for continuance. In her final two points of error, Rogers complains of the summary judgment granted on her non-libel claims. For the

reasons set forth below, we overrule Rogers' points of error and affirm the judgment of the trial court.

## FACTS

In 1972, when Rogers was 20 years old, she worked for a Virginia surgeon who specialized in surgically correcting head and facial deformities in children. Because those children often experienced psychological problems, Rogers decided to earn a masters degree in counseling. In 1976, Rogers moved to Dallas and began working for Dr. Kenneth Salyer, the first physician to perform craniofacial surgery in the Southwest. She also began working on her studies for a Ph.D. degree. In 1981, she and Salyer formed the Foundation for Craniofacial Deformities to facilitate the treatment, education, and research of craniofacial deformities in children. In 1983, Rogers and Salyer married, and in 1985, she was named president of the foundation. Because of the Salyers' prominence in Dallas' social and philanthropic circles, they were able to raise substantial contributions for the foundation and their efforts gained national attention. In 1988, the foundation was renamed the National Craniofacial Foundation ("NCF"). The Salyers were divorced the same year, and soon afterward, Rogers resigned as president of the NCF.

In 1989, Rogers formed the International Craniofacial Foundation ("ICF") to sponsor information and research programs and to assist children who were unable to afford reconstructive surgery. Rogers financed this new organization with her own funds, totaling some $250,000, which included some of the money she received in her divorce settlement. ICF often accomplished its goals by arranging for others to donate services. Thus, if a child was not insured or not fully insured, ICF would ask the hospital or surgeon to donate the uninsured portion of their services. Among others helped by ICF's sponsorship were twelve Soviet children who were provided craniofacial surgery. ICF

1. The Honorable Frank G. Evans, Chief Justice, Court of Appeals, First District of Texas at Houston, Retired, sitting by assignment.

2. The Honorable Paul W. Nye, Chief Justice, Court of Appeals, Thirteenth District of Texas at Corpus Christi, Retired, sitting by assignment.

also negotiated an agreement with the Soviet Children's Fund to "help the Soviets create and equip craniofacial centers and to help the fellowship train Soviet doctors in the U.S." In April 1990, a team of Soviet health officials came to Dallas to visit hospitals treating people with facial deformities. The News reported this tour to be a joint effort between the ICF and the Soviet Children's Fund.

Rogers recruited a number of celebrities to serve as ICF honorary officers and board members. Among those appointed to the Board were Cher, Senator Robert Dole, Dallas Mayor Annette Strauss, and Dallas businessmen G. Ray Miller (who served as board president) and Henry S. Miller, III.

Rogers also staged a series of public events to raise ICF's profile. Although these events did not generally generate significant financial returns, Rogers believed they were necessary to create a community awareness, recruit contributors, and demonstrate the need for private funding. In early 1990, Rogers arranged for Dick Clark to host a fund-raiser in Dallas. She recruited a local fund-raiser, the defendant Dolores ("Dee") Hutcheson, to serve as chairperson of the event. In March 1990, the Dick Clark "Rock Around the Clock" fund-raiser was publicly announced, and a local newspaper ran a picture of Rogers, Dick Clark, Dee Hutcheson, and G. Ray Miller.

During the months that followed, a rift developed between Rogers and Hutcheson over the management of the Dick Clark Rock Ball. Hutcheson wanted the affair to be a black-tie, sit-down dinner but that idea was at odds with the Dick Clark format. As the conflict escalated, Hutcheson complained that the Rock Ball contributions were not being deposited into a separate bank account. Hutcheson resigned as chairperson in August 1990, later expressing concerns that Rogers had been using ICF funds for personal purposes. She said that she had heard similar rumors from a former News gossip columnist, John Hawkins, and that she had sug-

gested to Hawkins that he contact the News and the *Dallas Times Herald* about her resignation. Hutcheson apparently wanted the Dallas newspapers to publish "some article" showing that she was no longer associated with the Dick Clark Ball.

A reporter from the *Dallas Times Herald* interviewed Hutcheson and Salyer and concluded the dispute was personal and not newsworthy. The News, according to Hutcheson, said they could not do an article unless the story came through the District Attorney's office or "had been investigated." In 1990, Hutcheson filed a formal complaint with the District Attorney suggesting the "suspected misuse of charitable funds."

The News assigned the story to one of its reporters, the defendant, Olive Talley.[3] Talley first interviewed Hutcheson, and a month or so later, started interviewing members of the board of Salyer's new organization, Child Works. In mid-December 1990, Talley called Rogers and said she wanted to do an article comparing ICF with Child Works and asked to see ICF's financial records. She assured Rogers she was not "trying to do a negative piece." The next day, Talley interviewed Rogers for about two hours. During the interview, Rogers was cooperative but apparently reluctant to discuss her divorce with Salyer or his new organization. In February 1991, Talley conducted a longer interview with Rogers and was given an ICF internal document entitled "Patient Assistance In–Kind and Cash Donations 1989–1990." Rogers explained that this document and other ICF internal financial records were unaudited and that their data should not be considered the "final truth" because they were the subject of a pending audit. Rogers promised to make the audit available to Talley as soon as it was released.

In March 1991, Rogers staged a fund-raising tea at the Mansion on Turtle Creek, which had as its focus the surgery of a craniofacially deformed child, Maree Matejic. Cher had paid for Maree's surgery through the ICF and had come to Dallas for the

---

3. Several years earlier, Talley had worked for the *Houston Post,* and had written a series of articles dealing with investigations of foundations and charities. According to the summary judgment affidavit of Dr. John Black, Rogers' "journalism expert," each of those articles was cast as a "morality play," with a standardized formula of "villains and victims."

surgery and to attend the event at the Mansion. During the course of the tea, Talley approached one of the mothers of a child being assisted by ICF. She told the mother that she did not want Rogers to know she was being investigated because it would give her an opportunity to cover her tracks. She then told her that she had evidence that Rogers was misusing ICF funds for personal expenses. She asked the mother how she felt about having her son "paraded in front of all these rich people, while knowing he had not been helped by ICF." The mother responded by telling Talley about the help ICF had given her child. She then admonished Talley to examine things more closely before making such accusations.

In April 1991, Rogers received the audit report and immediately called Talley. When Talley saw the report, she became agitated because the figures were different from those she had seen earlier. She said that her story was to be published two days later on April 14, 1991, and she demanded to know why she had not been provided the information earlier.[4]

On Sunday, April 14, 1991, Talley's copyrighted eight-page article entitled "Image vs. Reality" appeared in the News. It was the first of twelve articles written by Talley about Rogers and the ICF. Because this article is the primary focus of Rogers' libel claims, we have copied it verbatim despite its considerable length. The highlighted statements are those that Rogers contends are false. [Editor's Note: See Appendix.]

## LIBEL CLAIM

### Rogers' Contentions

In her first point of error, Rogers discusses each of the highlighted portions of the News article and explains why she considers those statements to be false:

1. *News' Statement:* "Contrary to the perception left among some in the crowd, none of ICF's funds underwrote any of the

surgeries for the children Ms. Rogers presented at the Mansion."

*Alleged Falsity:* Rogers contends this statement is false because Maree Matejic's surgery was arranged through ICF and she was presented at the event in absentia. Rogers also points to summary judgment evidence showing that ICF was responsible for the surgery of several other children presented at the affair, and argues that the News failed to offer conclusive proof that no ICF funds were used to underwrite any of the surgeries.

2. *News' Statement:* "In June 1989, for example, the foundation spent $6,000 to produce a song and record about ICF. The music was recorded, but only two records—both of them gold like the kind commemorating top-selling albums—were made 'for show,' Ms. Rogers said. One was given to a donor. The other hangs in the front office of ICF."

*Alleged Falsity:* Rogers contends the News failed to produce any evidence showing this statement to be true, and argues that there is in fact summary judgment evidence showing the statement to be false. According to Rogers, when she was interviewed by Talley, on February 14, 1991, she advised her that $6,000 had been used to produce a music video, which ICF used repeatedly in fund-raising. She points out that Talley's interview notes confirm this conversation.

3. *News' Statement:* "The March 14 tea for Cher is the most recent event in which the charity has spent more on promotions than on medical care or support for its clients."[5]

*Alleged Falsity:* Rogers contends that when in-kind contributions are taken into consideration, the amount spent on patient assistance far exceeds the amount spent on fund-raising, and that this discrepancy in reporting is reflected in the summary judgment evidence. Thus, she submits, a jury could reasonably conclude from the evidence that the reporter's statement was false.

---

4. In her deposition, Talley admitted that April 14th was not a firm deadline and that she made changes in her article after she received a copy of the audit.

5. We note that this particular statement was repeated in each of Talley's subsequent articles.

4. *News' Statement:* "The Dick Clark Rock Ball, the organization's largest gala ever, left the charity with many unpaid bills, including a $36,000 debt to the Grand Kempinski Hotel."

*Alleged Falsity:* Rogers contends there is summary judgment evidence showing that ICF did not owe $36,000 to the Grand Kempinski Hotel and that ICF disputed this claim. Thus, she argues, a jury could reasonably find that $36,000 was not owed as stated in the News article.

5. *News' Statement:* "Ms. Rogers said her expenses in 1988 totaled about $18,000, which 'in my mind, you know, didn't really amount to a lot' in comparison to the nearly $700,000 she said she raised for the foundation that year."

*Alleged Falsity:* Rogers denies making this statement and contends a jury could reasonably find the reporter's statement to be false.

6. *News' Statement:* "But the public wouldn't suspect that the charity was so debt-ridden, based upon the image carefully cultivated by its dynamic 39–year–old founder, who describes herself as 'flashy'."

*Alleged Falsity:* Rogers refers us to her deposition testimony to support her contention that the News statement was untrue. She points out that her use of the term "flashy" during her deposition referred to the perception that other people had of her, not of how she viewed herself.[6] Thus, she argues, a jury could reasonably find the reporter's statement to be false.

With respect to the second News article, published April 16, 1990, Rogers complains of the following statement by Talley:

The charity said it has provided $427,319 in cash and services toward care for patients in 1989 and 1990. Of that amount, ICF spent only $30,000 in cash, or about 10% of the charity's cash revenues for the same period.

Rogers claims that this statement was false because the preliminary audit shows the total spent on patient assistance to be $113,-445, not $30,000 as alleged by the News. According to Rogers, this represents 43% of total cash revenue, not 10% as the News reported. Thus, she contends, this is some evidence that the News statement was false.

In support of her contention that the statements were defamatory, Rogers points to the statutory definition of libel set forth in Tex. Civ.Prac. & Rem.Code Ann. § 73.001 (Vernon 1986). Section 73.001 reads as follows:

A libel is a defamation expressed in written or other graphic form that tends *... to injure a living person's reputation* and thereby expose the person to public hatred, contempt or ridicule, or financial injury or *to impeach any person's honesty, integrity, virtue, or reputation ...* and thereby expose the person to public hatred, ridicule, or financial injury.

*Id.* (emphasis added).

Rogers argues that the allegations in Talley's articles injured her reputation because they suggested that Rogers had used the plight of deformed children to raise money which was later squandered on glitzy fundraising galas. She claims that the News articles (1) led her readers to a conclusion of chicanery, if not outright fraud; and (2) caused the State Attorney General's office to begin its investigation of ICF. Further, Rogers asserts that Talley used false information to enhance her misleading portrait of Rogers, suggesting: (1) that ICF used only 10% of its funds to aid children; (2) that the Rock Ball had incurred a deficit; and (3) that Rogers had spent money on publicity stunts, such as $6,000 for a pair of gold records. Finally, Rogers complains of Talley's description of ICF's false image as being "based on the image carefully cultivated by its dynamic 39–year–old founder who describes herself as 'flashy'." To emphasize this point, Rogers refers to Talley's last article which described

---

**6.** Ms. Rogers' deposition testimony went as follows:

Q: You Told—you told Ms. Talley in the interview that you were flashy?
A: I told Ms. Talley at the interview that people described me as flashy.

Q: And you said, that's me?
A: I said people describe me as flashy, she's dressed well, how can she do that, and I said, that's me.

the ICF's Third Annual Kid's Christmas Party as low-key and "in stark contrast to the past when ICF's glitzy, high-dollar events placed Ms. Rogers squarely in the spotlight."

The eleven News articles succeeding the April 14, 1991 article are of a similar vein to the lead article, but those reports concentrate on the attorney general's investigation of ICF. Suffice it to say that all twelve articles tend to contrast ICF's "image," as depicted by Rogers, with the "reality" of its charitable achievements.

Because we conclude that the summary judgment record conclusively shows that the News articles, considered in their entirety, are substantially true, we find it unnecessary to consider the factual accuracy of each of the highlighted statements. Thus, although the defendants have responded to each of Rogers' arguments in lengthy detail, we need not repeat their arguments here.

## Standard of Review

The standard for reviewing summary judgments is well-established. The movant for summary judgment has the burden of showing there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *See Nixon v. Mr. Property Management Co.*, 690 S.W.2d 546, 548–49 (Tex.1985). In deciding whether there is a disputed material fact issue preluding summary judgment, we must take evidence favorable to the non-movant as true. *Id.* We must indulge every reasonable inference in favor of the non-movant and resolve any doubts in its favor. *Id.*

■■■ The purpose of the summary judgment rule is to eliminate patently unmeritorious claims or untenable defenses. *See Gulbenkian v. Penn*, 151 Tex. 412, 252 S.W.2d 929, 931 (1952). The summary judgment rule does not provide for a trial by deposition or affidavit. The rule provides a method of summarily ending a case that involves only a question of law or no genuine issue of fact.

*See Gaines v. Hamman*, 163 Tex. 618, 358 S.W.2d 557, 563 (1962). The rule is not intended to deprive litigants of their right to a full hearing on the merits of any real fact issue. *See Gulbenkian*, 151 Tex. 412, 252 S.W.2d at 931.

## Applicable Law

■■■ To recover on her claim for libel, Rogers was required to prove that the defendants published a false, defamatory statement about her. *See McIlvain v. Jacobs*, 794 S.W.2d 14, 15 (Tex.1990); *Carr v. Brasher*, 776 S.W.2d 567, 569 (Tex.1989); *A.H. Belo Corp. v. Rayzor*, 644 S.W.2d 71, 79 (Tex. App.—Fort Worth 1982, writ ref'd n.r.e.).[7] In Texas, the truth or falsity of a libel defendant's statement is determined by using the "substantial truth" test. *McIlvain*, 794 S.W.2d at 15–16. Under that test, we must examine the twelve articles, in their entirety, and decide whether the summary judgment record conclusively shows that the "gist" of the articles is substantially true. *Id* at 16. This evaluation requires us to determine whether, in the mind of the average reader, the alleged defamatory statements were more damaging to Rogers' reputation than truthful statements would have been. *Id.* If we conclude that the underlying facts as to the gist of the defamatory charges are undisputed, then we may disregard "any variances with respect to items of secondary importance," and decide, as a matter of law, that the articles are substantially true. *Id.* If we decide, as a matter of law, that the News articles are substantially true, our inquiry ends and we must affirm the trial court's summary judgment. *Lewis v. A.H. Belo Corp.*, 818 S.W.2d 856, 858–861 (Tex.App.—Fort Worth 1991, writ denied).

## Application of Law to Facts

■■■ The summary judgment record in this case consists of nine volumes of transcript and contains more than 2600 pages of evi-

---

7. Regardless of whether Rogers is considered a private person or a public figure, she would still be required to prove that the News defendants' objectionable statements were false. *See McIlvain*, 794 S.W.2d at 15 (private-figure plaintiff must show speech at issue is false to recover damages for defamation from media defendant); *Carr*, 776 S.W.2d at 569 (to recover for defamation, public figure must prove that defendant published defamatory statement and that false statement was made with actual malice).

dence. After examining the News articles in light of this extensive record, we conclude that the underlying facts as to the gist of the articles are undisputed and, disregarding any variances with respect to items of secondary importance, we determine as a matter of law that the articles are substantially true. *See McIlvain*, 794 S.W.2d at 16. Although Rogers may disagree with the accuracy of isolated passages, she has not challenged the underlying facts constituting the gist of the defamatory charges, and those undisputed facts are conclusively established by the summary judgment evidence.

The April 14, 1991 News article, and all those that followed it, focus on the "image" (as distinguished from "reality") of ICF and its founder as a legitimate charitable enterprise.

The News articles described Rogers' history as president of NCF, her ex-husband's foundation, and reported her eventual resignation from that post in the wake of rumors regarding her alleged misuse of NCF funds and her penchant for lavish entertaining. The articles also reported allegations of similar misuse of ICF funds and quoted ICF board members and former employees regarding Rogers' extravagant and wasteful spending of ICF funds.

A former ICF board member (who was also ICF's largest single contributor) was reported in the News article as saying it was a "valid complaint" for people to criticize the foundation's chaotic finances. He reportedly told Rogers that they "had to become a little more professional in [their] operation." A former employee was reported as saying that Rogers' penchant for poorly planned promotions and fund-raisers kept the charity in the red. She said Rogers always wanted the biggest and the best, despite the fact she was representing a non-profit organization. The criminal complaint filed by Hutcheson with the District Attorney's office gave the following explanation for filing the complaint:

> Numerous people have indicated that [Rogers] should be investigated, but no one has come forth. Therefore, I take it upon myself to request an investigation because I am concerned that the money given in good faith, not only by Dallasites, but by people throughout the U.S., may not go for the purpose given, which is for corrective surgery for facially deformed children.

The April 14 article concludes with a reported interview with ICF's new financial officer, who admitted that ICF's reputation in Dallas' social circles was "somewhat negative," but said he was committed to getting the charity back on track financially. According to the News article, Rogers had the same objective: "My goal for '91 is to get my hands around every dollar, where it goes and what it's for and to be able to be a better hands-on kind of person ... I would challenge anyone to do what we've done in two years against adversity." On this note, the News article ends.

In essence, the News articles raised questions about Rogers' financial competency as ICF's chief executive officer and about whether she had misled the public about ICF's charitable achievements. The summary judgment record shows the News articles to be founded on facts that, except for isolated discrepancies in matters of secondary importance, are undisputed. We conclude, therefore, that the defendants conclusively established the substantial truth of the News articles, and that the trial court properly entered a take-nothing summary judgment as to Rogers' libel claim. *See McIlvain*, 794 S.W.2d at 15–16. Consequently, we overrule Rogers' first point of error.

Our holding with respect to the first point of error makes it unnecessary for us to consider Rogers' second (statements defamatory), third (fact issue on malice), and fourth (statements not privileged) points of error. TEX.R.APP.P. 90(a).

### CONTINUANCE

In her fifth point of error, Rogers claims the trial court erred in overruling her motion for continuance, asserting that this prevented her from investigating the authenticity of audio cassette tapes produced by the News defendants. In the court below, Rogers argued that discrepancies between the tape recordings raised questions of evidence tampering, and she therefore sought to post-

pone the summary judgment hearing so that experts could examine the tapes.

We need not address the propriety of the trial court's decision to deny the requested continuance. Our decision regarding the substantial truth of the articles is dispositive of the appeal; thus, the authenticity of the tapes is not an issue that we need decide. TEX.R.APP.P. 90(a). We note, however, that by the time Rogers moved for this continuance, the trial court had already granted four continuances, albeit three by the parties' agreement. The decision whether to grant yet another continuance was a matter peculiarly within the court's discretion. *See State v. Wood Oil Distrib., Inc.,* 751 S.W.2d 863, 865 (Tex.1988). Rogers has not shown the court's decision to be an abuse of discretion. Rogers' fifth point of error is overruled.

## NON–LIBEL CLAIMS

■ In her final two points of error, Rogers contends the trial court erred in granting summary judgment on her "non-libel" claims of civil conspiracy, intentional infliction of emotional distress, and tortious interference with contract. Rogers first argues that the News defendants failed to move for summary judgment on her non-libel claims, and that the summary judgment granted in their favor should therefore not have disposed of those claims. We overrule this contention.

In their supplemental motion for summary judgment, the News defendants asserted that the summary judgment proof conclusively established the truth of the News articles and showed that "the News accurately reported the questionable financial dealings with ICF under the stewardship of Ms. Rogers." In their supplemental motion, the News defendants prayed that the court grant a summary judgment on *all* claims asserted by the plaintiff. We conclude that the News defendants' supplemental motion sufficiently presented the non-libel claims and that the trial court was therefore justified in disposing of Rogers' non-libel claims. *See McConnell v. Southside I.S.D.,* 858 S.W.2d 337, 341 (Tex.1993).

■ Next, Rogers argues that the trial court erred in granting summary judgment on any of her non-libel claims. Again, we disagree. Rogers' non-libel claims were all grounded on her libel cause of action. Thus, in order to recover on the non-libel claims, Rogers had to prove the falsity of the alleged defamatory articles. *See Hustler Magazine v. Falwell,* 485 U.S. 46, 56, 108 S.Ct. 876, 882, 99 L.Ed.2d 41 (1988); *Eimann v. Soldier of Fortune Magazine, Inc.,* 680 F.Supp. 863, 866 n. 3 (S.D.Tex.1988). Because we have previously found the News articles to be substantially true, we conclude that Rogers failed to meet the condition precedent to recovery on her non-libel claims. Thus, we conclude that the court properly granted summary judgment as to Rogers' non-libel claims. Rogers' sixth and seventh points of error are overruled.

The judgment of the trial court is affirmed.

## APPENDIX

### EXHIBIT 1

#### The Dallas Morning News

Sunday, April 14, 1991

IMAGE VS. REALITY

**High-profile charity awash in debt; founder defends expenses, operations**

By Olive Talley

*Staff Writer of* The Dallas Morning News

© 1991, The Dallas Morning News

When Cher finally arrived, almost two hours late at The Mansion on Turtle Creek, Marcy Rogers unabashedly stole one of her lines.

Ms. Rogers, charting her own "rise and fall, and rise again" in Dallas philanthropy, told the $100–a–seat crowd: *"Whatever you've heard about me, you haven't heard enough."*

With Cher, the glitziest of her volunteers seated beside her at the head table, Marcy Rogers was about to embark on one of the grander moments in the frenetic history of her International Craniofacial Foundations Inc.

One by one, Ms. Rogers introduced six children, each of whom has lived with badly

deformed faces. She asked the children how many operations they had undergone; each time, the audience gasped. "Seven," said Katie. "Fourteen," said Jeannelle.

"To think that the only thing that keeps these kids from being able to be helped to live a normal life is money," Cher told the crowd moments later.

"They don't need a cure, they just need the money. Their parents can't possible afford this kind of money for an operation."

Nor could Ms. Rogers' International Craniofacial Foundations Inc.

Contrary to the perception left among some in the crowd, none of ICF's funds underwrote any of the surgeries for the children Ms. Rogers presented at The Mansion.

In each of the six cases, the families and their insurance companies paid for the operations. In most cases, the surgeries were performed even before Ms. Rogers created ICF in February 1989.

Ms. Rogers said later that the children were introduced only so that "people could see them as people"—not necessarily as examples of her charity's work.

"We've done incredible things," Ms. Rogers said of the organization's two-year existence. "It's easy to sit back and criticize, but we're creating a first here. I hope to learn from our mistakes and grow from them.

"Someone once said, 'They only shoot arrows at pioneers.' "

Carolyn Shamis, a prominent real estate broker, was in the audience that afternoon last month.

"It was powerful to see the children and to understand exactly what you're giving money for," said Ms. Shamis, who at the time was moved to tears.

But when the socialite real estate broker later learned that the Dallas charity had not paid for the surgeries, Ms. Shamis said: "I took it that those were the children that got fixed. ... That would have been misleading."

The March 14 tea for Cher is the most recent event in which the charity has spent more on promotions than on medical care or support for its clients. As of March, according to organization records examined by *The Dallas Morning News,* fewer than 40 patients have received direct monetary support for surgery to correct facial deformities. And in some cases, that financial assistance amounted to less than $100 per patient.

The image of International Craniofacial Foundations Inc. belies a four-person operation that today is awash in red ink. At last count and using the foundation's own figures, it was at least $78,000 in the hole, nine months late in filing its federal tax returns and still not complying with a Dallas ordinance that requires it to document its revenues and expenses.

But the public wouldn't suspect that the charity was so debt-ridden, based on the image carefully cultivated by its dynamic 39–year–old founder, who describes herself as "flashy."

Ms. Rogers not only has brought Cher to Dallas for tea. She also imported rock n' roll legend Dick Clark last September for a '50s ball, hosted an auction at the Soviet Embassy in Washington and was a special guest at a White House reception with first lady Barbara Bush. Locally, Dallas Mayor Annette Strauss has used her social and political contacts to open doors for the charity promoter.

The result, Ms. Rogers says, is a non-profit organization that has benefited thousands of families. And it has raised nearly $1 million in cash and contributions to support its primary goals of surgical care for the poor and educating doctors, parents and the public about craniofacial treatment.

Ms. Rogers has called the foundation's work "very successful" and said the public charity simply lacked the money to do more.

Some former employees, board members and volunteers, however, in interviews with *The News,* portray Ms. Rogers and her chaotic organization as longer on form than substance.

"Marcy is flighty, and you've got to understand that," said G. Ray Miller, a Dallas businessman and former board chairman for the organization.

"She is that type of person that jumps from pillar to post," he said. "She'll throw out a figure one day, and it will be a different figure the next day. She's not a financially competent person. She's a promoter, and she's promoting as best she can her foundation."

Even as Ms. Rogers paraded the six children at The Mansion, a staff writer and photographer for *People* milled through the crowd preparing a magazine piece. Cher played the mother of a child with a craniofacial disease in the movie *Mask* which, her publicist said, created her dedication to the craniofacial cause.

### 'Trouble with details'

Ms. Rogers' advocacy for "the kids," as she calls them, far outweighs any negatives on a ledger sheet, said Carolyn Johnson of Midland. Like others, Mrs. Johnson and her 10–year–old daughter, Jennifer, who suffered a facial deformity, have drawn emotional support from Ms. Rogers and the parental support groups she's helped organize.

"Marcy is very charismatic," said Mrs. Johnson, who with her daughter have met Cher and traveled to Washington at ICF expense to promote the charity. "To see her with the kids, it's incredible.

"She has trouble with details but, boy, she's got a dream like you wouldn't believe," said Mrs. Johnson, also a member of ICF's parental advisory board. "She goes for the brass ring every time, and she wants these kids to have first-class privileges."

Cathie Walsh, mother of one of the children introduced at Cher's tea, said Ms. Rogers' "sincerity is so tremendous."

"I don't think you can possibly overestimate the determination that she's had in ... doing for these children," Mrs. Walsh said.

An examination of ICF, its mission and its records, showed:

● ICF, according to a national charity watchdog group, is "not in very good financial shape" and appears to have "overstated" the amount it has spent on programs vs. administrative costs. In December, the organization provided promotional material that said 80 cents of every dollar in cash and contributions was spent on programs for the deformed. On Friday, an ICF official said the figure is closer to 60 cents.

● ICF says it has provided $427,319 in support of medical care for patients in 1989 and 1990. Of that amount, ICF spent only $30,000 in cash, or about 10 percent of the charity's cash revenues for the same period, according to foundation documents. The remainder was air fares, lodging, food, hospitalization and doctors' fees, all of which were donated by corporations and individuals.

● Ms. Rogers left as the head of a similar charity in 1989 after its badly splintered board accused her of spending charity funds on gifts and entertainment expenses, diverting restricted patient funds to meet pay-roll and other overhead costs, hiring her boyfriend as a bookkeeper, and other allegations.

● ICF's board never has reached full strength—the organization's bylaws require 15 members. The board has been racked by departures, with nine members resigning in less than two years. Although most praise Ms. Rogers, who also sits on the board, for her promotional skills, several said she has failed to maintain proper recordkeeping and often makes key administrative decisions herself. One member listed on the organization's honorary board, advice columnist Abigail Van Buren, said ICF is using her name without permission.

Last fall, a volunteer with ICF asked the Dallas County district attorney's office to examine the group's finances for possible fraud and misuse of funds.

"The matter is still pending, and we're waiting for additional information and documentation to be supplied before determining whether to initiate a criminal investigation," said Ted Steinke, head of the district attorney's specialized crimes division.

Other craniofacial charities openly have criticized ICF, refusing to refer clients because of what they say is the organization's lack of performance.

Let's Face It, a Massachusetts-based support group for people with facial disfigure-

ment, declines to include ICF in its 16–page resource list.

"I couldn't figure out that she's (Ms. Rogers) done anything," said Betsy Wilson, executive director of Let's Face It. "And I don't believe in referring people to someone unless they can give them help."

Priscilla Caine, executive director of FACES, a 20–year–old, Tennessee-based craniofacial charity, said three of her clients within the last six months sought financial help from ICF for surgery in Dallas.

"One was told that the request for funds was on too short a notice, and two were told that ICF had no funds available," Ms. Caine said.

FACES, with an annual budget of $132,-000, is helping pay travel costs for all three, and about 69 other patients across the nation.

Dr. Phyllis Casavant, former executive director of FACES, said Ms. Rogers makes lots of promises, but "there's nothing there that I ever saw."

"The thing that hurts the other craniofacial organizations is that Marcy seems to have a lot of access to publicity and seems to speak for all of us—and doesn't," Dr. Casavant said.

Ms. Rogers concedes that she may not be the best manager, but she believes she makes up for it in motivation.

"I think I can be criticized for not being a good money manager, because I have big dreams and I'm always trying to support the dreams," Ms. Rogers said.

"People look at me and say, 'She's flashy; she's dressed well,'" Ms. Rogers said. "But this is the style I'm comfortable with, because it can help me get to a Dick Clark. It helped me get the money I've raised. It's me."

"But," she said, "I also recognize the limitations and that it raises questions about me, and I'm trying to work on that."

Ms. Rogers began what she calls her "love affair" with craniofacial patients in 1972, while working in the office of a plastic surgeon in Charlottesville, Va.

"I went to this clinic ... and saw people and children I never knew existed," she said. "There were all these kids and parents, and it was so emotional."

An estimated 15,000 children are born each year with craniofacial deformities ranging from a cleft, or split lip or palate (sometimes called a harelip), to an extended forehead, retruding chin or misshapen nose.

More severe cases occur when babies are born without the soft spot in their skull that allows for growth. Without surgery, pressure from the brain will cause bulging eyes and eventually death.

It was these sights that brought focus to Ms. Rogers' life nearly two decades ago.

"My whole life I wanted to feel connected to somebody and feel like I was doing something worthwhile," she recalled. "For the first time, I felt like somebody needed me and whatever I did, I could see a difference."

Motivated by a desire to provide psychological counseling to these patients and their families, Ms. Rogers went to night school and earned a master's degree in education from the University of Virginia.

A move to Dallas in 1976 meant new jobs for Ms. Rogers and her husband, an architect. It also meant divorce. Ms. Rogers joined the staff of Dr. Kenneth Salyer, who performed the first craniofacial surgery in the Southwest.

In 1983, Dr. Salyer and Ms. Rogers were married. She became executive director of the Foundation for Craniofacial Deformities, a charity formed by Dr. Salyer in 1981.

"We watched the enthusiasm that Marcy brought, and we all felt this was a nurturing mother taking care of her infant, because it was, indeed, the child of Ken and Marcy Salyer," said Rosie Moncrief, who with her husband, state Sen. Mike Moncrief, were original board members of the non-profit corporation.

Dr. Salyer gave countless hours of free surgery to underprivileged children; his wife promoted his work.

The foundation was designed to support those who couldn't pay. Supporters said it was an irresistible charity because they saw virtually overnight, life-changing surgeries on poor children from Mexico, Guatemala and Korea, not to mention the 4–year–old blind piano prodigy from Baltimore, Germaine Gardner.

Ken and Marcy Salyer were featured in national magazines and newspapers and on network television shows, including *The Donahue Show.*

General Electric Foundation donated $300,000 to help underwrite surgeries; Dallas philanthropist Bill Barrett donated a van to haul children and their families to and from treatments; other donations came from the William Randolph Hearst Foundation, American Airlines and the Xerox Foundation.

And as the money rolled in, so did the political clout.

Mrs. Strauss hosted a luncheon for the foundation. "It kind of gave Marcy some instant credibility in the social fund-raising world, since Annette had done this," said one former publicist.

The mayor said she has heard criticisms of Ms. Rogers, but, "I look at the positives of it."

"Marcy Rogers has always been up-front and honest about everything that she's ever done that I know of," Mrs. Strauss said.

Other social heavyweights such as Cynthia Melnick, Pam Pappas and Linda Bomar kicked in support through a women's guild.

There were black-tie galas, country-Western concerts and parties in Washington to further the foundation's work.

To broaden its scope, the charity was renamed National Craniofacial Foundation in 1988.

The Salyers and their foundation were hot properties in Dallas' social circles—until their marriage hit the rocks.

As it crumbled, so did the charity.

### 'Misled and deceived'

When Ms. Rogers sued Dr. Salyer for divorce in June 1987, bitterness spilled into charity.

"If you would pick a time when things started coming unraveled, it would be the time when Ken and Marcy became estranged," said Mr. Miller, then a member of the board of the National Craniofacial Foundation and one of its largest donors.

"There was a lot of animosity on both sides, and words passed from mouth to mouth that were not conducive for good business operations," he said.

A year after the divorce was filed, the 7–year–old foundation was in a financial tailspin, but members of the foundation's board said they had no idea.

In December 1988, only after frustrated foundation employees complained to board members that the foundation was failing its mission because of a lack of funds, the board reacted with an internal examination.

Employees signed statements alleging financial abuses by Ms. Rogers. C.W. Moore, a van driver, for example, said in his statement that he spent about three hours each day on foundation time doing "personal chores," such as walking dogs, picking up laundry and grocery shopping for Ms. Rogers.

Another former employee, in an interview with *The News*, said that Ms. Rogers hid administrative costs in program costs, thus exaggerating the accomplishments of the charity.

Ms. Rogers' supporters said she was hard at work and had single-handedly built the foundation's revenues up to $468,000 in 1988. But critics said she also began using foundation money to supplement a $8,000–a–month lifestyle, to which she had grown accustomed as Dr. Salyer's wife, according to divorce records.

On Dec. 19, 1988, three days before a judge signed her divorce decree, board members of National Craniofacial Foundation confronted Ms. Rogers with allegations of fiscal irresponsibility.

An investigation by the board determined that she had diverted restricted funds for medical care to meet payroll and other overhead costs; hired a boyfriend as a bookkeeper; used the foundation's van as collateral on a loan to meet payroll; spent foundation funds on gifts and personal expenses; and rolled up thousands of dollars of bills for dining and entertainment at The Mansion, the Crescent Club, Sfuzzi's and Sam's Cafe records showed.

"Some of the board members strongly defended Marcy and said she simply was not a good manager," said Mrs. Moncrief. "Well, a lot of people are not good managers, but do they use foundation money to buy dresses, flowers, wine and crystal that was totally inappropriate for the foundation?

"There were alot of excuses about bookkeepers and why we didn't have anything in writing," Mrs. Moncrief said. "We'd hear grandiose reports, names of celebrities dropped and grants, and they sounded wonderful.

"We were misled and deceived."

But other members of the board, including Mr. Miller, viewed Ms. Rogers as the underdog in a bitter divorce and fought attempts to remove her from a foundation they credited her with building.

"I never saw anything that would give me rise to suspect anyone of any major wrongdoing," he said. He characterized the board's investigation as a "kangaroo court."

In her defense, Ms. Rogers said she told members of the executive committee in July 1988 that the foundation was in a financial crunch. She now acknowledges that she "painted a rosy (financial) picture" because she was "in a state of sheer panic."

"I was afraid that because of the divorce, that they were going to get rid of me," Mr. Rogers said. "I should have stood up, but I didn't know how to handle the situation. I never let people know what's going on when things are hard. ... I thought I could pull a rabbit out of a hat and that if we just got through this, everything would be OK."

Ms. Rogers said her expenses in 1988 totaled about $18,000, which "in my mind, you know, didn't really amount to a lot" in comparison to the nearly $700,000 she said she raised for the foundation that year. Tax returns, however, list the foundation's revenues at $468,000.

That type of conflicting information made the job of unraveling the foundation's problems difficult, according to former board president Bill E. Carter.

"I don't know that I got a straight answer from anybody," he said.

By late 1988 and early 1989, angry creditors, including Humana Hospital–Medical City Dallas, where Dr. Salyer had established his dream for a craniofacial surgical center, were stalking Ms. Rogers and the foundation's Oak Lawn office, demanding payment.

Several board members, fearful of financial liability, abruptly resigned.

All the while, callers who had heard about the foundation through national news stories and television shows, were ringing its toll-free number, begging for financial help.

Finally, many of the employees had enough.

"We were told ... to just tell people we were waiting on funds to come in," said one former employee. "I would a lot of times turn the calls over to her (Ms. Rogers) because she could lie better than I could. She always had some kind of story."

Employees said that the foundation misled the public to believe "that we paid for everything" relating to patients' medical treatment. "We put them up in hotels and drove them to and from the hospitals.... We helped, but we were just kind of an aid. We were not the healers."

After surviving the board's attempt to remove her, Ms. Rogers finally quit the foundation in early 1989. The foundation was dissolved months later, and its debts negotiated or written off.

Ms. Rogers said a vindictive ex-husband orchestrated her demise.

"Marcy brought about her own demise," said Dr. Salyer, whose communication with her for two years has been only through lawyers. "I have not taken any steps or activities or anything to try and deal with Marcy in any way."

Those who know her—both supporters and detractors—believe she fell victim to her own thirst for social acclaim.

Originally, she had good intentions, and then she got caught up in the social life and lost sight of where and why it all started," said one former friend.

### Starting over

Ms. Rogers refused defeat.

"When I left the foundation, I'll never forget," she said. "I woke up the day after I left, and I didn't know who I was anymore because from 1972, this had occupied my whole life."

Within days, Ms. Rogers resurrected her dream, this time in the form of International Craniofacial Foundations Inc., which she patterned after its predecessor. Only ICF's goals would be even grander.

"I felt there was so much that could be done for these children, so I decided to start ICF and to create something as I wanted and as I envisioned it to be," she said.

Besides, her reputation was at stake.

"I wasn't going to leave Dallas until I proved to myself that I could rebuild it, resurrect it and ... (show) all those people who were pointing fingers at me," she said.

Today the lines between the old and new foundations have become so blurred that even Ms. Rogers' biggest supporters and volunteers frequently are confused.

The blurred lines are no accident, according to Ms. Rogers' former husband, Dr. Salyer.

"She really took every single thing that she thought was good from the (NCF) foundation and tried to take it with her (to ICF) and claim it as part of her situation and tried to leave everything that was bad or negative.

"She is a very convincing person," Dr. Salyer said. "And the perception is that she does have a lot of influence and power and certainly is capable and expert at marketing."

At the Cher party last month, Jesse Jackson Jr., chairman of an upcoming June fundraiser in Dallas for ICF, credited the group with the corrective surgeries of child piano prodigy Germaine Gardner, who has become a poster child of sorts. In fact, the 7–year-old boy's surgeries were performed by Dr. Salyer and arranged through the now-defunct NCF, but paid by the family's insurance.

When the new foundation opened, it did so with the same toll-free number that had belonged to NCF.

### 'The biggest and best'

When Ms. Rogers was faced with questions about International Craniofacial Foundations Inc., she referred *The News* to a charity watchdog group called National Charities Information Bureau which, she said, "knows about ICF."

The bureau's records indicate that Ms. Rogers queried the New York-based organization once in 1988 when she then represented National Craniofacial Foundation—four months before International Craniofacial Foundations Inc. was formed.

According to the charity monitoring group, Ms. Rogers again contacted them in November 1990, requesting disclosure forms that are a prerequisite for obtaining the group's endorsement.

"We haven't heard a word since," said Daniel Langan, spokesman for the charities bureau.

*The News* provided the charities bureau with copies of all financial records, patient assistance lists and promotional materials it obtained from ICF.

Milton White, a research associate with the charities bureau, said ICF would probably fail most of the nine standards it uses to gauge accountability of national charity groups.

Mr. White said ICF's increasing debt violates the group's policy against non-profits' having a persistent deficit in their unrestricted fund balances. Combined with a deficit of $27,138 from its first few months of operation, ICF's deficit totaled about $180,000 as of June 1990, according to a preliminary audit.

Douglas McKinnon, a certified public accountant who joined the board in January and was elected treasurer, said he had taken control of the books and reduced the debt to $150,000 by late February. And by Friday, according to ICF's figures, the debt had been reduced to about $78,000, not including money owed Ms. Rogers.

One of the charities bureau's standards requires charities to spend at least 60 percent of their annual expenses on programs. Mr. White said ICF might have trouble meeting that goal if the value of donated goods and services were removed from its calculations.

"They seem to be relying on a lot of donated materials, and that's fine," Mr. White said. "But in our analysis, we generally don't include donated materials. And when that's taken out, their program expenses are a lot lower, and support revenue is a lot lower."

As an example, the organization's cumulative patient list for 1989–1990 lists $427,319 worth of cash and contributions for 28 patients.

Of that amount, only $30,387 was ICF's own cash, the record shows. That underwriting ranged from $46.81 in one case to $9,226.62—which paid hotel and some hospitalization for a child from Zaire.

And although Ms. Rogers said ICF has assisted many more than the 28 patients cited on its list, she could not provide an exact number. According to other documents provided by the organization, The News estimated that the total number of patients who have received support toward medical care was fewer than 40.

ICF's preliminary audit for fiscal year 1990 lists total program expenses as $226,160. That amount paid for educational mailings, a program to train Soviet doctors, public awareness and social events designed to allow children with craniofacial diseases and their families to share their experiences.

During the four-month period ending in October 1990, which covered the Dick Clark Rock Ball, ICF spent $128,948 in cash on special events, according to unaudited figures. The report showed that the charity netted $44,775 during that same period.

The charity spent more in four months on fund-raising events than it had in two years for patient assistance, the records indicate.

The Dick Clark Rock Ball, the organization's largest gala ever, left the charity with many unpaid bills, including a $36,000 debt to the Grand Kempinski Hotel.

Mr. Clark and Cher did not respond to News requests for comments.

It was the issue of fiscal responsibility that prompted an employee of ICF to quit the charity after six months. The woman spoke on condition that she not be named.

She said much of the spending was simply extravagant or wasteful. But when she began to see what she believed to be wrongdoing, the former employee said she would not tolerate it and quit. Ms. Rogers said the woman was fired.

"She would incur debt without thinking," the former foundation official said. "I tried to get her to follow a budget, but she'd say, "We've got to spend money to make money and we'll worry about paying bills later."

"I did at one point carry the checkbook with me in my car so she wouldn't write checks to herself," said the former employee.

"She would put money in the foundation to make monthly expenditures, but then she'd say, 'I spent $7,500 on this, so I need that money back now because I can't pay my rent or make my car payment,'" the former employee said.

Ms. Rogers admits she has written checks to herself, but she said she was simply reimbursing herself for legitimate expenses she incurred, in most cases for funds she put into the charity.

As of last month, Ms. Rogers said she had put in well over $100,000 of her own funds. $90,000 to be paid back by the charity. Another $51,000 is owed her in accrued salary, she said.

The figures are an indication, said former board president Miller, of her commitment to the charity: "That's putting the point where the heart is."

Ms. Rogers explained it as simply keeping the charity alive.

"Whatever it took to do that, that's what I had to do," she said. "I cashed in my pension plan so that I could help fund bills and keep Dick Clark going.

"I felt like we had to hit the ground running and by doing lots of good works, we would vindicate the past and that once I got past the first two years, then it could get on a financial footing," Ms. Rogers said.

Mr. Miller, the organization's single largest contributor at more than $45,000 in cash and donations, said he believed ICF was in relatively good shape when he resigned in November to devote more time to his business. But he had not involved himself with the day-to-day operations of the charity, he said.

He said it was a "valid complaint" for people to criticize the foundation's chaotic finances and that he told Ms. Rogers that "we had to become a little more professional in our operation."

The former employee said it was Ms. Rogers' penchant for poorly planned promotions and fund-raisers that kept the charity in the red. "She always wanted the biggest and the best," the woman said. "If you had to pay for it, it was OK. That's not the attitude in non-profits."

In June 1989, for example, the foundation spent $6,000 to produce a song and record about ICF. The music was recorded, but only two records—both of them gold like the kind commemorating top-selling albums— were made "for show," Ms. Rogers said. One was given to a donor. The other hangs in the front office of ICF.

## Angry fund-raiser

Dee Hutcheson, a prominent Dallas interior designer, was no stranger to charity balls, having worked on events benefiting the American Heart Association, the USA Film Festival, the Dallas Civic Opera and TACA (The Auction for the Cultural Arts).

So Ms. Hutcheson agreed last year when Marcy Rogers asked her to be the honorary chairwoman for the Dick Clark Rock Ball.

"When she first asked me to chair this, she said the money raised would be used for reconstructive surgery for these children," Ms. Hutcheson said. "Your heart goes out to children with deformed faces, so I felt it was a worthwhile cause."

Ms. Hutcheson, however, resigned after five months because, she said, Ms. Rogers would not take steps she believed necessary to ensure the proceeds were spent on the kids. Ms. Hutcheson demanded a separate account for Rock Ball donations and demanded that they be controlled by a "budget and finance man"—not Ms. Rogers.

"She (Ms. Rogers) would call me and say she had some payments to make and needed the checks immediately," Ms. Hutcheson said.

Ms. Rogers wrote Ms. Hutcheson a letter on July 29, 1990, saying that ICF had entered into a "contractual arrangement" with an accountant at McCall McBride to serve as "ICF's interim chief financial officer."

Rick McCall, a partner at McCall McBride, recently told The News that his company "never looked at the books" for ICF because Ms. Rogers withdrew from contract negotiations.

"Numerous people have indicated that she should be investigated, but no one has come forth," Ms. Hutcheson stated in the complaint she filed in September with the district attorney's office.

"Therefore, I take it upon myself to request an investigation because I am concerned that the money given in good faith, not only by Dallasites, but by people throughout the U.S., may not go for the purpose given, which is for corrective surgery for facially deformed children."

Mr. Miller, ICF's board chairman until November, said he was unaware of the pending complaint and had seen no evidence of wrongdoing at the charity.

In January, Daner Wood, an insurance sales executive, was installed as president of the board, and Doug McKinnon, a certified public accountant and restaurant owner, as treasurer.

It was the first ICF board meeting either had attended. Mr. Wood said he met Ms. Rogers while trying to sell her insurance. Mr. McKinnon said he met Ms. Rogers at his Addison restaurant, where he hosted the charity's Christmas party.

Several board members, including Mr. Wood, said they lacked the information to discuss ICF's finances and operations in any detail.

Mr. McKinnon, who took control of ICF's checkbook and finances upon joining the board in January, said ICF needed a lot of financial overhauling.

He said the organization's methods of bookkeeping are "confusing," but he said he had seen worse.

And while he has heard questions about the charity's past problems and admits that ICF's reputation in Dallas social circles is "somewhat negative," Mr. McKinnon said he's committed to getting the charity back on track financially.

"My job is to make sure from this day forward things are better," he said.

That too, Ms. Rogers said, is her goal.

"With all the things that were being said about me, I have constantly been defending myself and trying to buy credibility," Ms. Rogers said.

"My goal for '91 is to get my hands around every dollar, where it goes and what it's for and to be able to be a better hands-on kind of person," she said.

"I would challenge anyone to do what we've done in two years against adversity."