ACCEPTED
05-14-01017-CV
FIFTH COURT OF APPEALS
DALLAS, TEXAS
2/13/2015 4:33:16 PM
LISA MATZ
CLERK

No. 05-14-01017-CV

In the Court of Appeals
for the Fifth Judicial District at Dallas, Texas

FILED IN
5th COURT OF APPEALS
DALLAS, TEXAS
2/13/2015 4:33:16 PM
LISA MATZ
Clerk

**JOHN TATUM AND MARY ANN TATUM**,
Appellants,

v.

**DALLAS MORNING NEWS, INC. AND STEVE BLOW**,
Appellees.

*On Appeal from the*
*68th District Court of Dallas County, Texas*
*Cause No. DC-11-07371*

**APPELLANTS' REPLY BRIEF**

Joe Sibley
State Bar No. 24047203
sibley@camarasibley.com
CAMARA & SIBLEY, LLP
4400 Post Oak Blvd., Ste. 2700
Houston, Texas 77027
P. (713) 966-6789
F. (713) 583-1131

*Counsel for Appellants*

**ORAL ARGUMENT IS REQUESTED**

i

# CITATION FORMAT

The following citation references will be used in this Brief:

- References to the Clerk's Record will be cited as "C.R. [page number, paragraph number, and/or line number]."

- References to Appellees' Response will be cited as "Resp. [page number]."

- References to Appellants' Appendix to their original Brief will be cited as "App. [exhibit number]."

# TABLE OF CONTENTS

CITATION FORMAT ..................................................................................... ii

TABLE OF CONTENTS ................................................................................ iii

INDEX OF AUTHORITIES ........................................................................... iv

PRELIMINARY STATEMENT ........................................................................ 1

POINTS OF REPLY ....................................................................................... 3

    I. OF AND CONCERNING ......................................................................... 3

    II. DEFAMATORY MEANING ...................................................................... 5

        A.      Appellees Misrepresent the Tatums' Libel Claims and the Grounds for Their MSJ ................................................................... 5

        B.      The Gist of the Column is Defamatory. ............................................. 9

            1. The Column is not "rhetorical hyperbole." ..................................... 9

            2. The *Hancock* opinion does not assist Appellees. .......................... 13

            3. Appellees miscite *Rutt*. ................................................................. 14

    III. SUBSTANTIAL TRUTH ....................................................................... 15

        A.      An Accurate Portrayal of the Tatums Could Not Have Accused Them of Being Deceptive. ................................................. 15

        B.      Whether the Tatums Were Deceptive Can Be Proven False. ............. 19

    IV. ACTUAL MALICE .............................................................................. 23

    V. THE DTPA CLAIM ............................................................................. 25

CONCLUSION AND PRAYER ....................................................................... 27

CERTIFICATE OF SERVICE ........................................................................ 28

CERTIFICATE OF COMPLIANCE ................................................................ 28

# INDEX OF AUTHORITIES

## CONSTITUTIONS AND STATUTES

TEX. CIV. PRAC. & REM. CODE § 73.001................................................................ 4, 13

## TEXAS SUPREME COURT CASES

*Bentley v. Bunton*,
   94 S.W.3d 561 (Tex. 2002)................................................................ 10, 23

*Buck v. Palmer*,
   381 S.W.3d 525 (Tex. 2012)..................................................................... 23

*Celtic Life Ins. Co. v. Coats*,
   885 S.W.2d 96 (Tex. 1994)....................................................................... 26

*City of Houston v. Clear Creek Basin Auth.*,
   589 S.W.2d 671 (Tex. 1979)....................................................................... 8

*Ex parte Tucci*,
   859 S.W.2d 1 (Tex. 1993)........................................................................... 4

*Hancock v. Variyam*,
   400 S.W.3d 59 (Tex. 2013)............................................................. 7, 13, 14

*McConnell v. Southside Indep. Sch. Dist.*,
   858 S.W.2d 337 (Tex. 1993)....................................................................... 8

*Musser v. Smith Protective Servs., Inc.*,
   723 S.W.2d 653 (Tex. 1987)..................................................................... 12

*Neely v. Wilson*,
   418 S.W.3d 52 (Tex. 2013)................................................................. 15, 27

*Newspapers, Inc. v. Matthews*,
   339 S.W.2d 890 (Tex. 1960)..................................................................... 3, 4

*Star-Telegram, Inc. v. Doe*,
   915 S.W.2d 471 (Tex. 1995)..................................................................... 15

*Travis v. City of Mesquite,*
    830 S.W.2d 94 (Tex. 1992)..............................................................................8

*WFAA–TV, Inc. v. McLemore,*
    978 S.W.2d 568 (Tex.1998)............................................................................6

### TEXAS COURT OF APPEALS CASES

*ABC, Inc. v. Gill,*
    6 S.W.3d 19 (Tex. App.—San Antonio 1999, pet. denied) ...............................4

*Allied Mktg. Grp., Inc. v. Paramount Pictures Corp.,*
    111 S.W.3d 168 (Tex. App.—Eastland 2003, pet. denied) ...............................3

*Am. Heritage Capital, LP v. Gonzalez,*
    436 S.W.3d 865 (Tex. App.—Dallas 2014, no pet.)..........................................6

*Morris v. Dallas Morning News, Inc.,*
    934 S.W.2d 410 (Tex. App.—Waco 1996, writ denied) ...................................22

*Rogers v. Dallas Morning News, Inc.,*
    889 S.W.2d 467 (Tex. App.—Dallas 1994, writ denied) ..................................26

*Sellards v. Express-News Corp.,*
    702 S.W.2d 677 (Tex. App.—San Antonio 1985, writ ref'd n.r.e.) ...................16

*Toles v. Toles,*
    113 S.W.3d 899 (Tex. App.—Dallas 2003, no pet.)...........................................6

### UNITED STATES SUPREME COURT CASES

*Greenbelt Coop. Pub. Ass'n, Inc. v. Bresler,*
    398 U.S. 6 (1970)............................................................................................11

### UNITED STATES DISTRICT COURT CASES

*Crompton Greaves, Ltd. v. Shippers Stevedoring Co.,*
    776 F. Supp. 2d 375 (S.D. Tex. 2011)..............................................................22

*Gateway Logistics Grp., Inc. v. Dangerous Goods Mgmt. Australia Pty, Ltd.,*
    No. H–05–2742, 2008 WL 1883914 (S.D. Tex. Apr. 25, 2008) .........................10

*Glenn v. Daddy Rocks, Inc.*,
 171 F. Supp. 2d 943 (D. Minn. 2001)....................................................................... 5

*Steaks Unlimited, Inc. v. Deaner*,
 468 F. Supp. 779 (W.D. Pa. 1979)........................................................................... 11

## SISTER STATE CASES

*A.S. Abell Co. v. Kirby*,
 176 A.2d 340 (Md. 1961) ......................................................................................... 10

*Rutt v. Bethlehems Globe Publ'g Co.*,
 484 A.2d 72 (Pa. 1984)............................................................................................ 14

## SECONDARY SOURCES

PROSSER ON TORTS § 622 (2d ed. 1955)...................................................................... 10

THAYER, LEGAL CONTROL OF THE PRESS § 66 (3d ed.1956) ................................... 10

## PRELIMINARY STATEMENT

In 2010, no one would have believed that "Iron Mike" Ditka would want to discourage his grandchildren from playing football because of the effects of concussions on mental health. Since 2010, however, a number of prominent NFL players have committed suicide as a result of injuries sustained during their football careers and the effects these injuries had on their mental capacity. These events caused both hardened NFL veterans like Ditka and the medical community to examine more closely the significance of traumatic brain injuries such as concussions and their link to behavioral abnormalities such as suicide.

While today's public is generally familiar with this phenomenon, at the time that Paul Tatum took his own life in May of 2010, the research evidencing the link between brain injury to suicidal behavior was just beginning to gain notoriety. Based on that emerging science—that has since been broadly accepted by the scientific community—the Tatums attributed Paul's suicide to head injuries sustained in a car accident shortly before his behavioral changes that culminated in suicide. The Tatums have expert testimony that supports their claim that was fully admitted into evidence.

The issue in this case is not whether the Tatums were scientifically correct in reaching that conclusion. This issue is whether the Tatums—as they were accused of in the Column—were acting with deception in expressing that conclusion in the

1

Obituary.  Accusing the Tatums of acting with deception in writing their son's obituary in order to mislead others as a means to cover up a suicide, mental illness, and their own potential responsibility for their son's death impugns their honesty, integrity, and virtue and assigns to them a corrupt motive.

The Tatums have been defamed.  As demonstrated in the opening Brief, the trial court erred in granting summary judgment against them and this case should be remanded for trial.  As discussed in further detail below, Appellees' attempt to support the trial court's judgment in their Brief is wholly unavailing.

## POINTS OF REPLY

### I. OF AND CONCERNING

Appellees' Brief misstates and misleads on whether the Column is "of and concerning" the Tatums.

Appellees admit that the Column references Paul Tatum—even though he is not specifically named—but disputes that it is of and concerning Mr. and Mrs. Tatum. Resp. 13. What Appellees gloss over, however, is that the Column is referencing Paul Tatum by <u>criticizing his Obituary</u>. No reasonable reader would believe that Paul Tatum authored his own Obituary. The only inference an ordinary reader could make is that the deceased's family was the deceptive author. In fact, Blow understands that the Column is directed toward the Tatum family when he states in the Column "[l]isten the last thing I want to do is put guilt on the <u>family</u> of suicide victims." App. C (emphasis added).

A publication is "of and concerning the plaintiff" if persons who knew and were acquainted with him understood from viewing the publication that the defamatory matter referred to him. *Allied Mktg. Grp., Inc. v. Paramount Pictures Corp.*, 111 S.W.3d 168, 173 (Tex. App.—Eastland 2003, pet. denied) (citing *Newspapers, Inc. v. Matthews*, 339 S.W.2d 890, 894 (Tex. 1960)). Here, the Tatums have offered evidence that numerous individuals read the Column and knew it was referring to the Tatums. *See* C.R. 1924, at ¶ 4; C.R. 1741–52; C.R.

3

1635, at 29:3–22. In fact, many people who had read Paul Tatum's Obituary in the preceding weeks knew that the Column was referring to the Tatums. *See* C.R. 1741, 1743, 1746–47, 1748. On this basis alone, the "of and concerning" element of the Tatums' libel claims is satisfied or, at a minimum, there is a fact question on this issue.[1]

Moreover, The News's own internal documents demonstrate that random readers of the Column also identified the Tatums. Carol Yancey—who was later featured by Blow in one of his columns—sent Blow an email on Nov. 30, 2010, which referred to the "Jesuit family" who did not disclose suicide in the obituary. C.R. 2126. Since "Jesuit" was not mentioned in the Column, the only place Ms. Yancey could have learned that the Tatums were a Jesuit family is by cross-referencing the Obituary that was referenced in the Column. Moreover, Ms.

---

[1] Appellees' contention that "[w]hether a plaintiff is referenced in an allegedly defamatory statement is a question of law" is dubious at best. *See* Resp. 12. Appellees rely on *ABC, Inc. v. Gill*, 6 S.W.3d 19, 34 (Tex. App.—San Antonio 1999, pet. denied). Appellees correctly point out that this case was disapproved on other grounds by *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 115 (Tex. 2000), however, Appellees do not signal for the Court in the citation that *Gill* relies on *Matthews*.

The portion of *Matthews* referenced by the *Gill* court is construing the predecessor statute to TEX. CIV. PRAC. & REM. CODE § 73.001, which statutorily defines libel. *See Matthews*, 339 S.W.2d at 893. The case simply holds that a business owner cannot recover for libel for a statement that was of and concerning a business and not the business owner because the existing statute only provided for defamation of a "person" (i.e. a natural person or formal legal entity) and not for a "business." *See id.* at 893. The case does not hold, as the *Gill* court surmises, that the "of and concerning" analysis is a pure question of law in every instance. *Cf. Ex parte Tucci*, 859 S.W.2d 1, 20 (Tex. 1993) (Phillips, C.J., concurring) (noting the common law rule that the "of and concerning" prong of defamation is a fact question for the jury).

4

Yancey's impression from the Column was exactly what the Tatums feared readers would conclude – that they were trying to "cover up" Paul's suicide to conceal an overlooked mental illness. *See id.* Thus, multiple readers of the Column who did not know the Tatums were able to identify them from the details disclosed in the Obituary.[2]

Accordingly, Appellees Brief fails to rebut the Tatums' evidence and law demonstrating that the Column is of and concerning them.

## II. DEFAMATORY MEANING

### A. Appellees Misrepresent the Tatums' Libel Claims and the Grounds for Their MSJ

Apparently realizing that the body of law clearly favors the Tatums' position on defamatory meaning, Appellees have regrettably resorted to serious misrepresentations in their Brief.

In their live pleading on file when the Trial Court considered Appellees' Motion for Summary Judgment ("MSJ") and when it entered final judgment, the Tatums pleaded claims for libel <u>and</u> libel *per se*. C.R. 391–92. The Tatums did not use the Latin descriptive phrase "*per quod*" in their pleadings in association

---

[2] Appellees' reliance on *Glenn v. Daddy Rocks, Inc.*, 171 F. Supp. 2d 943, 948 (D. Minn. 2001) is misplaced. In that case, the court held that a flyer referring to a "bar downtown" in Minneapolis, Minnesota, was not sufficiently descriptive to be "of and concerning" a particular bar in that city. *Id.* at 748. Here, there has been specific reference to an Obituary that identifies the Tatums by name, which was published in the same paper as the Column and which gives sufficient details (high school student, "recent" death, car accident) to identify the Tatums.

with their conventional libel claim. *See id.* Most litigants and courts refer to libel *per quod* as simply "libel" and that is all the Tatums did here. *See, e.g., Am. Heritage Capital, LP v. Gonzalez*, 436 S.W.3d 865, 874–75 (Tex. App.—Dallas 2014, no pet.) (discussing and referring to libel *per quod* simply as "libel"). However, the elements of a conventional libel claim (a.k.a. libel *per quod*) were pleaded and the Tatums alleged the defamatory Column damaged them. *Compare id. with WFAA–TV, Inc. v. McLemore,* 978 S.W.2d 568, 571 (Tex.1998) (outlining same elements of conventional libel claim pleaded by Tatums). In their Response to the MSJ, the Tatums reiterated the fact that they had brought claims for libel and libel *per se*. *See* C.R. 1300.

In any event, neither Blow nor The News ever filed any special exception or other motion directed at those pleadings complaining of any alleged Latin deficiencies in the Tatums' pleadings. They would have been required to do so in order to challenge any alleged pleading defect along these lines. *See Toles v. Toles*, 113 S.W.3d 899, 915 (Tex. App.—Dallas 2003, no pet.) ("Generally, a movant must specially except before urging a motion for summary judgment that alleges a failure to state a claim, thereby giving the plaintiff an opportunity to amend deficient pleadings.").

Regardless, this issue was never raised or even mentioned in Appellees' MSJ. *See generally* C.R. 1186–1220. Appellees did not move for summary

6

judgment on the grounds that that the Colum was not defamatory *per se* – only on the grounds that it was not reasonably capable of defamatory meaning. *See id.*

These are different inquiries and courts apply different standards in examining them. In *Hancock v. Variyam*, 400 S.W.3d 59 (Tex. 2013), the Texas Supreme Court recently addressed this issue:

> As an initial matter, the parties note we have yet to decide whether the determination of a statement as defamatory *per se* is a question for the court or the trier of fact. The court must first determine whether a statement is reasonably capable of a defamatory meaning from the perspective of an ordinary reader in light of the surrounding circumstances. If the statement is not reasonably capable of a defamatory meaning, the statement is not defamatory as a matter of law and the claim fails. Likewise, the determination of whether a statement is defamatory *per se* is first an inquiry for the court. If the court determines that an ordinary reader could only view the statement as defamatory <u>and further concludes</u> that the statement is defamatory *per se*, it should so instruct the jury and have the jury determine damages.

*Id.* at 66 (emphasis added) (citations omitted).

Thus, as reflected in *Hancock*, a court is first to determine defamatory meaning. It may then engage in a <u>further</u> analysis to determine whether such defamatory meaning, if any, rises to the level of *per se* defamation. *See id.* Here, Appellees only moved for summary judgment on the first of these points and did not ask the Trial Court to make any findings on whether the Column was defamatory *per se*. Moreover, Appellees did not move for summary judgment on

any element of damages flowing from the Tatums' libel claims.[3] *See* C.R. 1187–88. Therefore, the Tatums were not even required to adduce evidence of any damages or to address whether the Column was libelous *per se*.[4]

In short, the only issue before the Trial Court and before this Court is whether the Column is capable of defamatory meaning. Whether damages flow from such defamatory meaning *per se* or conventionally (*per quod*) is not a question that was presented before the Trial Court and, therefore, cannot be before this Court because a motion for summary judgment must stand or fall on the grounds expressly presented in the motion. *McConnell v. Southside Indep. Sch. Dist.*, 858 S.W.2d 337, 341 (Tex. 1993). A trial court may not grant summary judgment on a ground not presented by the movant in writing. *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 677 (Tex. 1979). Likewise, on appeal, the issues reviewed by the appellate court "must have been actually presented to and considered by the trial court." *Travis v. City of Mesquite*, 830 S.W.2d 94, 100 (Tex. 1992).

---

[3] And this underscores the fact that Appellees did not raise the *per se/per quod* issue with the Trial Court because the only way these distinctions become relevant is with respect to proof of damages.

[4] Nevertheless, the Tatums did in fact outline evidence of their mental anguish, emotional distress, and reputational injury in their Affidavits in support of their Response to the MSJ. *See* C.R. 1386–87, at ¶¶ 13–14; C.R. 1394–95, at ¶¶ 13–14 and C.R. 1924, at ¶6 (corroborated by their minister).

Accordingly, Appellees' "*per se*" versus "*per quod*" argument should be ignored and the Court should focus only on the issue of whether the Column is capable of defamatory meaning.

**B. The Gist of the Column is Defamatory.**

Appellees make other arguments that the Column is not reasonably capable of defamatory meaning, all of which are equally unavailing.

1. The Column is not "rhetorical hyperbole."

In their Brief, Appellees make the frivolous argument that the Column's accusation of deception and dishonesty toward the Tatums was not to be taken seriously, but was instead "rhetorical hyperbole." *See* Resp. 19–20. In other words, according to Appellees, an ordinary reader would not take the accusation of deception in the Column seriously.

Besides Blow's testimony that he knew that the Column would likely bring reproach on the Tatums, the Column itself acknowledges that it is likely to put "guilt" on the Tatum family. *See* App. C. Moreover, the Column closes by stating that "honesty"—the opposite of deception—saves lives, which suggests not only that the Tatums were dishonest, but also that the alleged dishonesty resulted in fatal consequences. *See id.* There is nothing rhetorical or hyperbolic about the Column – it is an indictment of the Tatums and accuses them of a deception that is a part of an allegedly widespread problem that puts "lives at risk." *See id.*

9

Indeed, Appellees cannot cite to a single case where accusations of dishonesty were held not to be capable of defamatory meaning. The Texas Supreme Court recognized in *Bentley v. Bunton*, 94 S.W.3d 561, 582 (Tex. 2002) that:

> The greater number of Courts have held that the imputation of a corrupt or dishonorable motive in connection with established facts is itself to be classified as a statement of fact and as such not to be within the defense of fair comment.

*Id.* (quoting *A.S. Abell Co. v. Kirby*, 176 A.2d 340, 343 (Md. 1961) (citing PROSSER ON TORTS § 622 (2d ed. 1955); THAYER, LEGAL CONTROL OF THE PRESS § 66 (3d ed.1956)).

Consistent with the observation in *Bentley*, in a case from the Southern District of Texas, *Gateway Logistics Grp., Inc. v. Dangerous Goods Mgmt. Australia Pty, Ltd.*, No. H–05–2742, 2008 WL 1883914 (S.D. Tex. Apr. 25, 2008), the defendant argued—like here—that an email that contained the statement "in my opinion [plaintiff] has taken the art of lies & deception to a level almost beyond belief," was protected opinion and not actionable for defamation. *Id.* at *11. In applying Texas law, the court held that this statement was not protected opinion and was defamatory, citing multiple Texas authorities on this doctrine. *See id.* The court also noted that when the term "deceitful" is used in connection with a specific act, then defamation *per se* has been committed. *See id.* (also holding the

10

statement "our relationship with [plaintiff] has been terminated as a result of this greedy, deceitful, and very stupid plan" as libel and not protected opinion).[5]

The cases Appellees rely on to demonstrate rhetorical hyperbole are nothing like this case. For example, in *Bresler*, a real estate developer was in negotiations with the city of Baltimore for the acquisition of land owned by the developer. *Greenbelt Coop. Pub. Ass'n, Inc. v. Bresler*, 398 U.S. 6, 7–8 (1970). The hard-nosed negotiating of the developer caused some in the community to label his negotiating tactics as "blackmail." *See id.* The Court held that no reasonable reader could really equate this description of hardball negotiating tactics with the crime of blackmail. *See id.* at 13–14. The Court characterized this description as "rhetorical hyperbole" in that no one could possibly believe there were accusations of an actual crime. *See id.*

The holding of *Bresler* and other "rhetorical hyperbole" cases is, essentially, that accusing Jerry Jones of committing "highway robbery" with respect to ticket prices for Dallas Cowboys' games cannot be actionable defamation because no reasonable listener or reader would ever equate selling tickets to football games with the felony offense of robbery. It does not hold that—like here—when

---

[5] Cases from other jurisdictions have likewise held that accusations of deceit and deception are defamatory. *See, e.g.*, *Steaks Unlimited, Inc. v. Deaner*, 468 F. Supp. 779, 783 (W.D. Pa. 1979) (holding that that a statement that a vendor of meat engaged in "totally deceptive and misleading" advertising was defamatory) (cited by *Gateway Logistics Group*).

11

someone is accused of an actual deceptive or dishonest act that this does not constitute libel.

In further support of this specious argument, Appellees rely on *Musser v. Smith Protective Services, Inc.*, 723 S.W.2d 653 (Tex. 1987) for the proposition that because the Tatums had the legal right to be deceptive in the Obituary, the Column cannot be defamatory for accusing them of doing it. In *Musser*, a plaintiff sued for libel over a letter from his former employer that accused the employee of taking business accounts of the former employer with him when he left. *See id.* at 655. The court noted that this accusation amounted to nothing more than accusing him of being well qualified in his line of business and taking business with him. *See id.* The court found nothing unethical about this conduct, since competition was essentially the basis of a free market economy and should be expected. The letter did not include any accusations of violating a non-compete or other illegal actions. *See id.* Therefore, it was not deemed capable of defamatory meaning. *See id.*

*Musser* does not hold, as Appellees suggest, that a person cannot be defamed so long as they are accused of doing something they had the "legal right" to do. Musser turned not just on the fact that the plaintiff was not accused of doing anything illegal, but also unethical. *See id.* This argument proves far too much and, indeed, would turn defamation law on its head. People have the "legal right"

12

to be liars and to be dishonest. Lying and dishonesty are—in most cases—not against the law, but yet still bring the contempt of society. This is why the Legislature has statutorily defined libel as "a defamation expressed in written or other graphic form that tends to [...] impeach any person's honesty, integrity, virtue, or reputation and thereby expose the person to public hatred, ridicule, or financial injury." TEX. CIV. PRAC. & REM. CODE § 73.001. If the Legislature had intended to restrict libel *per se* to only those accusations involving a violation of the law, then the statute would have been worded as such. There is no case or other authority under any jurisdiction that limits libel to only allegations of illegal conduct.

Accordingly, Appellees' "rhetorical hyperbole" argument should be ignored.

2. The *Hancock* opinion does not assist Appellees.

Appellees rely heavily on the authority of *Hancock* for the proposition that accusations of dishonesty are not always defamatory. In that case—unlike here— the defendant moved for summary judgment on the issue of damages. *See Hancock*, 400 S.W.3d at 63. The *Hancock* court went on to hold that the statements at issue in that case were not defamatory *per se* because they did not injure the plaintiff in his occupation, as was alleged. *See id.* at 67–68. The *Hancock* court <u>did not</u> hold that the statements at issue that alleged dishonesty were not defamatory. In fact, the court specifically stated "[h]aving concluded that

13

Hancock's statements were not defamatory *per se*, we need not decide whether the statements were defamatory because—even if they were as a matter of law—there is no evidence of actual damages." *See id.* at 68. As discussed above, damages are not before this Court because it was not a ground raised in Appellees' MSJ.

3. Appellees miscite *Rutt.*

Realizing the obvious implications of *Rutt v. Bethlehems Globe Publishing Co.*, 484 A.2d 72, 74–75 (Pa. 1984), Appellees attempt to downplay the significance of its holding. Appellees pretend that the *Rutt* holding turned on the fact that the news column made "express accusations" against family members. *See* Resp. 23. This is false. The libelous column in that case stated that the plaintiff's son committed suicide "a couple days after the victim's father asked him to leave his home" and uttered before he shot himself "he had no friends and no one loved him." *Rutt*, 484 A.2d at 74. The father claimed that the article defamed him by giving the impression that his son's suicide "was a suicide caused by the lack of love or affection of appellant for his son and was a result of the action of appellant in asking his son to leave his home." *See id.* This was not an express accusation of responsibility, but was rather—like here—a false impression that a parent had some responsibility for their son's suicide.[6]

---

[6] *Rutt* also held that a private suicide was not a matter of public concern. *See* 484 A.2d at 80-81. Appellees have presented no evidence that the failure to include suicide in an obituary is a matter of public concern. Blow's notion that such omissions are related to suicide prevention is merely an unsubstantiated assertion and is without any scientific foundation or clinical

14

For all of these reasons, Appellees' arguments regarding defamatory meaning are without merit.

## III.  SUBSTANTIAL TRUTH

To prevail on their substantial truth defense, Appellees would have to conclusively show[7] that the Tatums were deceptive (i.e., intended to mislead readers into believing something false) in writing the Obituary.  Appellees failed to meet this burden.

### A. An Accurate Portrayal of the Tatums Could Not Have Accused Them of Being Deceptive.

Had the Column told the truth, it would have accurately revealed the reason for the Tatums' reference to the car accident was not to deceive readers into believing there was not a suicide, but rather to inform them of their belief as to the <u>reason</u> for the suicide – a brain injury sustained in a car accident only hours before

---

justification. C.R. 1651, at 71:9–72:3; C.R. 1652, at 102:17–23; C.R. 1655, at 112:9–23; C.R. 1658, at 131:5–23; C.R. 1660, at 161:6–162:9. The Tatums have adduced evidence that there is, in fact, no connection between obituary disclosure and suicide prevention. *Id.*

Moreover, a "logical nexus" should exist between the private facts disclosed and the general subject matter.  *See Star-Telegram, Inc. v. Doe*, 915 S.W.2d 471, 474 (Tex. 1995). However, these private facts "may be irrelevant when the details are not uniquely crucial to the case, or when the publisher's `public concern' goes to a general, sociological issue." *Id.*  Here, Appellees could have made whatever misguided point they sought to make regarding suicide in obituaries without referencing the Tatums or their Obituary.

[7] The News bears the summary-judgment burden to <u>conclusively</u> prove that the Column is substantially true, regardless of who bears the truth/falsity burden at trial. *See Neely v. Wilson*, 418 S.W.3d 52, 66 n. 21 (Tex. 2013).

Paul Tatum's death. This would have cast the Tatums in a much more favorable light than accusing them of deception that "puts more lives at risk." *See* App. C.

Contrary to Appellees' assertions, there is nothing inconsistent between the Tatum Obituary's statement that Paul Tatum died as a result of a brain injury sustained in a car accident and the death certificate, which states that the immediate cause of death was a "shotgun wound of the head" and that the manner of death was "suicide."[8] *See* App. C. As discussed in the Tatums' Brief, the death certificate describes the immediate cause of death and the manner of death – not what caused the suicide (i.e., the cause of the manner of death). The following description of various scenarios is instructive.

### a. Scenario "A"

A man is walking with a loaded shotgun. He trips and falls and the gun discharges into his head, killing him.

On the death certificate the immediate cause of death would be "shotgun would to the head." The manner of death would be "accidental."

---

[8] Appellees also falsely claim there were "police findings" regarding Paul Tatum's suicide. There were not. Appellees are referring to the unofficial statements of one police officer that expressed his opinion—to Mr. Tatum only no less—regarding the reason for Paul Tatum's suicide and this is not relevant. *See Sellards v. Express-News Corp.*, 702 S.W.2d 677, 680 (Tex. App.—San Antonio 1985, writ ref'd n.r.e.) (overhearing unofficial statement from police officer not sufficient to establish substantial truth as to what police reported).

16

*b. Scenario "B"*

A man is shot in the head with a shotgun fired by an assailant, killing the man.

On the death certificate the immediate cause of death would be "shotgun wound to the head." The manner of death would be "homicide."

*c. Scenario "C"*

A man puts a shotgun to his head and pulls the trigger, which kills him.

On the death certificate the immediate cause of death would be "shotgun wound to the head." The manner of death would be "suicide."

As discussed in the Tatums' Brief, this is the extent of what the medical examiner and death certificate can tell us. The death certificate cannot tell us, and the medical examiner does not inquire as to, for example, "why" the man tripped and fell in Scenario A. Did he have a disability? Was he on crutches? Was he simply clumsy? Likewise, in Scenario B, perhaps the man was murdered in a hate crime, or maybe it was gang violence. We simply are not told "why" the manner of death occurred from the death certificate or the medical examiner. Similarly, as the medical examiners repeatedly stated, they do not determine why, in Scenario C, a person commits suicide. C.R. 1484, at 117:7–10, 118:7–17; C.R. 1485, at 123:3–7; C.R. 1490, at 201:14–19, 203:23–204:7; C.R. 1491, at 205:10–13; C.R. 1493, at 215:3–15; C.R. 1498, at 38:10–39:20; C.R. 1500, at 70:9–18.

17

Let us consider another scenario.

### d. Scenario "D"

A man is a walking and trips and falls, striking his head that causes a concussion that, in and of itself, is not life threatening. The concussion disrupts the man's mental faculties, which causes him to change his behavior and begin to have suicidal thoughts. The man then shoots himself in the head with a shotgun.

On the death certificate, the immediate cause of death would be "shotgun wound to the head." The manner of death would be "suicide."

Thus, the death certificate here would read exactly the same as in Scenario C. However, the "but for" or <u>proximate cause of death</u>[9] that is not disclosed on the death certificate, would be the accidental fall that caused the concussion. This does not make the death "accidental" because the immediate cause of death, the shotgun wound, did not occur in an accident – it was self-inflicted.

Here, the Tatums do not contend—as Appellees repeatedly and disingenuously accuse them of—that Paul Tatum's death was "accidental." The shotgun blast that ended Paul Tatum's life did not occur in a car accident. However, the injury that set his suicidal thought process in motion did occur in the

---

[9] Both medical examiners testified that if Paul Tatum suffered a brain injury in the car accident that caused him to commit suicide then the language chosen by the Tatums in the Obituary is literally true. C.R. 1487–88, at 175:19–176:2, 180:18–25; C.R. 1499, at 54:12–55:9. However, as stated elsewhere in the Tatums' briefing the medical examiners do not seek to answer this question and this is not information that would be included in the death certificate.

18

car accident. This is not something that the death certificate can speak to. Thus, both the death certificate and the Obituary are accurate and neither contradicts one another because they are speaking to different subject matter – one deals with the proximate cause of death and the other deals with the immediate cause and manner of death.

It would be no different if, for example, the family members of one of the NFL players who committed suicide stated in an obituary that they player died "as a result of injuries sustained playing football." There is nothing deceptive about this characterization despite the fact that the official immediate cause of death would list a gunshot wound.

Accordingly, Appellees cannot conclusively demonstrate it is substantially true that the Tatums acted with deception.

## B. Whether the Tatums Were Deceptive Can Be Proven False.

The Tatums were accused of being deceitful by stating the proximate cause of their son's death as opposed to the immediate cause of their son's death. Whether the Tatums were deceitful in this respect can be proven true or false because the jury can look at evidence that supports the Tatums' belief that brain injuries sustained in the car accident was the proximate cause of their son's

19

suicide.[10] The Tatums offered expert testimony that was admitted into evidence that supports this conclusion.[11] C.R. 1844-48. Appellees offered no expert testimony to contravene these opinions.

Instead, in a futile attempt to mask the weakness of their position, Appellees now argue that Paul Tatum was not involved in a car accident after all. *See* Resp. 34–36.

Appellees' argument makes no sense. They argue that because there is no direct evidence that Paul Tatum was in a car accident and sustained a brain injury, that it is just as likely that Paul Tatum committed suicide because he was

[10] In support of this argument, Appellees cite to cases from other jurisdictions deal with the state of mind of a suicide victim. This is not the issue here, it is the Tatums'—living persons—state of mind that is at issue and their intentions in writing a suicide victim's obituary.

In Texas the law is clear. The imputation of corrupt or dishonorable intentions is actionable for defamation. *See Bentley*, 94 S.W.3d at 582-83. Appellees' argument that a defamation plaintiff can never sue for being accused of acting with deceptive or corrupt motives is not only at odds with Texas law, it defies common sense and logic. It makes no sense that a person can be sued for civil fraud (acting with the requisite mental state of intent to misrepresent) but that same person cannot bring an action for defamation based on false accusations of fraud since this would necessarily involve that person's mental state.

Likewise, and more to the point here, what sense does it make that the law will allow a defamation defendant to disprove actual malice by adducing evidence of his or her mental state, but a defamation plaintiff cannot sue for defamation if the alleged libel involves that plaintiff's mental state? This is yet another example of media arrogance by asking this Court to "rig" the law so far and unfairly in its favor that the prospect of a defamation claim against it becomes a perfunctory process whereby the media defendant always wins.

[11] Accessing the "black box" recorder from the Highlander, the Tatums' biomechanical engineering expert testified that the crash was in the "top 10%" in terms of severity, more than sufficient to cause a TBI (i.e., a concussion or worse). C.R. 1812, at ¶¶ 6–8; C.R. 1838–42; C.R. 1825–36. The Tatums' neurology expert testified that, given the severity of the wreck and the sudden and dramatic change in behavior following the accident, Paul most likely suffered a TBI that caused him to commit suicide. C.R. 1844–48.

20

remorseful over the accident. *See id.* Why would Paul Tatum be remorseful over an accident that he was not involved in? If he was remorseful over the wreck then he was necessarily in the wreck, and if he was not in the wreck then he necessarily could not be remorseful over it.

The reality is that the evidence overwhelmingly supports the fact that Paul Tatum was in serious car accident that would have put him at risk for a traumatic brain injury:

- Appellees admit that Paul Tatum was in a car accident in the Column itself. App. C.

- The police determined in their official records that Paul Tatum was the driver of the Toyota Highlander. C.R. 507, 518–28.

- Paul Tatum called Clayton Stitch and asked for a ride around 11 p.m. on the night of May 17, 2010. C.R. 510.

- No one else had access to the Toyota and there is no evidence anyone else was driving the Toyota the night it crashed. C.R. 1393, at ¶ 8.

- After Paul's body was taken to the coroner, the keys to the Toyota Highlander were found on his person and returned to the Tatums. C.R. 1393, at ¶ 8; C.R. 497.

- Paul Tatum had bruises on his lower left abdomen consistent with those left by a safety belt restraint system after an accident. C.R. 454; C.R. 1483, at 45:2–14.

- The medical examiner's official documents list Paul Tatum as having been in an accident. C.R. 454.

Thus, there is no question that the greater weight of the evidence supports the conclusion that Paul Tatum was involved in a serious car accident just before he died.[12] This is important and is probative of the Tatums' alleged deception because the Column lumped them in the same lot as the authors of the press release that attributed Ted Pillsbury's self-inflicted gunshot suicide to a heart attack. *See* App. C. Blow made it sound as though the Tatums had fabricated a cause of death to "cover up" the suicide, when in fact the Tatums were justified in believing that the car accident was a proximate cause of Paul Tatum's suicide.[13]

In *Morris v. Dallas Morning News, Inc.*, 934 S.W.2d 410, 417 (Tex. App.—Waco 1996, writ denied), the court concluded that a police officer who was reported to have beaten a suspect could survive a substantial truth motion for

---

[12] This case, unlike the "equal inference" cases relied on by Appellees, does not involve only "slight" circumstantial evidence. This case involves conclusions from the police and medical examiners, as well as other corroborating evidence. To conclude that anyone other than Paul Tatum was the driver of vehicle would be unreasonable. *See Crompton Greaves, Ltd. v. Shippers Stevedoring Co.*, 776 F. Supp. 2d 375, 390–91 (S.D. Tex. 2011) (applying Texas law and holding equal inference rule does not apply in case where circumstantial evidence—like here—is corroborated and points in one direction).

[13] *See id.*; C.R. 1654, at 108:18–25. In an eerily similar situation, Austin Trenum, a popular and well-adjusted adolescent, sustained a concussion in a football game on Friday night and hung himself within 36 hours. C.R. 1880–93. Prior to the head injury, he was "not depressed" or upset. *Id.* Dr. Ann McKee, a neuropathologist and co-director of the Boston University Center for the Study of Traumatic Encephalopathy reviewed Austin's pre- and post-accident behavior and brain tissue both of which revealed a traumatic brain injury, specifically a "multifocal axonal injury" (i.e., diffuse twisted and broken connections between nerve cells). *Id.* "Austin's case isn't unique," Dr. McKee reported. *Id.* "There have been other sudden inexplicable suicides following concussions." *Id.* "It's the same pattern," McKee says. *Id.* They have "disordered thinking" resulting from disruptions to the electrochemical signals that constitute normal brain function. *Id.*

summary judgment on the grounds that the court "must accept Officer Morris' depiction of his thought processes at the time as the truth." *See id.* The officer stated that he intended only to subdue the victim, not injure him. *See id.* Here, like in *Morris*, this Court must accept the Tatums' depiction of their state of mind (C. R. 1386 at ¶ 10; 1394 at ¶ 10) in writing the Obituary and send this matter to a jury.[14]

Accordingly, Appellees cannot demonstrate that the Column is substantially true.

## IV.  ACTUAL MALICE

Appellees' brief also fails to demonstrate a lack of actual malice in authoring the Column for many reasons.

Blow's expression of doubt about the "facts" in his Column to the Tatums' minister (C.R. 1924, at ¶ 5) already provides sufficient evidence of malice. Additionally, a "lack of care or an injurious motive in making a statement is not alone proof of actual malice, but care and motive are factors to be considered." *Bentley*, 94 S.W.3d at 596. A defendant's "state of mind can—indeed, must usually—be proved by circumstantial evidence." *Id.* Evidence of Blow's "state of mind" is seen in the following:

---

[14] Likewise, in a non-defamation case, the Texas Supreme Court reaffirmed this proposition of law in *Buck v. Palmer* by recognizing affidavit testimony that created a "genuine issue of material fact as to the [plaintiff's] intent" and denied summary judgment. 381 S.W.3d 525, 528 (Tex. 2012).

23

- Blow was in a state of "outrage" about the Tatum Obituary. C.R. 1573.

- Blow described the Tatums as "fair game" for criticism due to their allegedly deceptive obituary. C.R. 1455, at 149:5–10.

- Blow was aware when he wrote the Column that his criticism of the Tatums "in the wake of death" would hurt them. C.R. 1751.

- Blow criticized parents who had just lost a child with publication on Father's Day, and despite his claim to have been unaware of the holiday date, he insisted he still would have published on Father's Day had he known. C.R. 628–29, at 61:22–62:7; C.R. at 1453–54 at 124:21–126:10.

- Blow admitted that he sensationalized the Column by making an example of the Tatums to keep the Column from being, in his own words, "tepid and forgettable." C.R. 1710–11.

- Blow testified that he received 100 positive emails in response to the Column including 20 from mental health professionals, which is simply a lie as there is no evidence to support receipt of a single positive email. C.R. 1451–52, at 101:8–102:21.

- Blow provided publicity for his friend, Julie Hersh, who had recently launched a publicity campaign around her self-published memoire. C.R. 1554 at 180:8–24; C.R. 1545-46, at 104:20-105:8.

- Blow failed to contact the Tatums which journalism expert Fred Brown (C.R. 1576–78, at 122:21–123:17, 202:15–23, 237:7–18; C.R. 1913, at ¶¶ 6-8) and DMN editor Bob Mong (C.R. 1423–24, at 134:14–137:1; C.R. 1425–26, at 144:11–145:15) agree violates basic journalism standards.

- Blow fabricated an excuse for not contacting the Tatums (Contrast Blow's story at C.R. 1446, at 72:16–23; C.R. 1460, at 247:23–248:7 contradicted by Tomaso's and Simpson's denial at C.R. 1509–10, at 27:15–28:6 and C.R. 1909–10, at ¶¶ 3–5).

For all of these reasons, Appellees fail to negate actual malice.

## V. THE DTPA CLAIM

Appellees accuse the Tatums of "creatively plead[ing]" around First Amendment protections by asserting a DTPA claim. Resp. at 49. They claim that the Tatums' only complaint is about the Column, and not about the Obituary, which the Tatums paid for and were satisfied with. *Id.* This argument fails for two reasons.

First, the Tatums' DTPA claim has nothing to do with the truth or falsity of the Column. The DTPA misconduct was inducing the Tatums to purchase the Obituary and to word it however they wished without disclosing that The News had a columnist on staff with a history of criticizing obituaries.[15] Even if the Tatums told bald-faced lies in the Obituary and the Column were 100% true, the DTPA claim would still lie because the claim rests on the non-disclosure on the part of The News. The very act of criticizing a bereaved family's obituary—legitimate or not—after inducing them to purchase the obituary and word it as they

---

[15] Blow admits that he reads obituaries like a "detective," looking for "clues to the things left unsaid." C.R. 1470. Blow wrote a column criticizing Samuel Knapp for failing to include in his daughter's obituary that she was a lesbian and refusing to accept her homosexuality. C.R. 1757; C.R. 1754-55, at ¶2-6. Blow failed to interview Knapp. *Id.* Blow's column caused gay rights protesters to threaten to picket the funeral, and a SWAT team was dispatched to protect Knapp at the funeral. *Id.* Knapp, himself a Dallas area law enforcement officer, lacked the financial resources to pursue legal action against Blow. *Id.* Blow's obsession with criticizing obituaries has obtained international notoriety. C.R.1786–96; C.R. 1758–67; C.R. 1769–84. *See* also Blow's Column "Sin of Omission" which criticized a family for failing to disclose execution for murder in the obituary and making positive comments about the deceased. C.R. 1468.

wish is the basis of the DTPA claim. The Column, in and of itself, is not the basis of the DTPA complaint – rather it is the fruit of The News' deceptive conduct that damaged the Tatums.

Second, the two causes of action are distinct despite their simultaneous accrual. A cause of action accrues when "facts come into existence that authorize a claimant to seek a judicial remedy." *Celtic Life Ins. Co. v. Coats*, 885 S.W.2d 96, 100 (Tex. 1994) (explaining that the Plaintiff's DTPA claim accrued when the insurer denied coverage, not when the misrepresentation was made that induced the plaintiff to purchase the policy). Here, the Tatums' DTPA claim accrued not when they purchased the Obituary, but when The News published the Column. C.R. 392–93. So of course they "had no complaints regarding their paid Obituary until the Column was published." Resp. at 49 (emphasis in original). They still have no complaints *about the Obituary*. Their complaint is based on nondisclosure of risks that would have made them think twice about buying the Obituary, which risks were realized when the Column was published.

Appellees' reliance on *Rogers* is misplaced. There, the plaintiff sued The News under several causes of action including libel, civil conspiracy, IIED, and tortious interference. *Rogers v. Dallas Morning News, Inc.*, 889 S.W.2d 467, 474 (Tex. App.—Dallas 1994, writ denied). This Court noted that *all* of the plaintiff's claims were grounded in the truth or falsity of the allegedly defamatory statements.

26

*Id.* The plaintiff could not survive summary judgment on the libel claim because she could not establish falsity.[16] Therefore, the non-libel claims failed as well. *Id.* Here, as discussed above, the DTPA and libel claims are not interdependent and do not depend on the truth or falsity of the Column.

## CONCLUSION AND PRAYER

For all of the reasons discussed above and in the Tatums' Response Brief, the Court should reverse the MSJ Order and remand the case for trial.

---

[16] *Rogers* is further inapplicable because it placed the summary judgment burden on the plaintiff to prove falsity. *Id.* at 472. More recently, the Texas Supreme Court clarified that at summary judgment, the defendant must conclusively establish truth, regardless of who carries the truth/falsity burden at trial. *See Neely*, 418 S.W.3d at 66 n. 21.

27

## CERTIFICATE OF SERVICE

I hereby certify that on this 13th day of February 2015, a true and correct copy of the Appellants' Reply Brief was sent by email to Appellees' counsel of record.

*/s/ Joe Sibley*
Joe Sibley

## CERTIFICATE OF COMPLIANCE

This is to certify that the relevant portions of this computer-generated Appellant's Reply Brief contain 7,105 words.

*/s/ Joe Sibley*
Joe Sibley
Dated: February 13, 2015